UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 03-CR-331 (CKK) |
| | ) | |
| v. | ) | |
| | ) | |
| WALDEMAR LORENZANA-LIMA, | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

## I.    INTRODUCTION

The United States of America respectfully submits this Memorandum in Aid of

Sentencing, in accordance with 18 U.S.C. § 3553(a).   As set forth below, a sentence within the

Guidelines range of 324 to 405 months imprisonment is sufficient, but not greater than

necessary, to comply with the purposes of 18 U.S.C. § 3553(a); and is in accord with the terms

set forth in the plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(B).   The

sentencing hearing is currently scheduled for March 24, 2015 at 9:30 a.m.

## II.    BACKGROUND

### A.  Procedural History

On March 10, 2009, a federal grand jury returned an Indictment against the Defendant

Waldemar LORENZANA-LIMA, also known as "Valdemar Lorenzana-Lima" or "Don Valde,"

(hereinafter "LORENZANA-LIMA" or "Defendant") charging that, from in or around 1996 and

continuing thereafter up to and including 2009, from the countries of Colombia, El Salvador,

Guatemala, and Mexico, and elsewhere, the Defendant conspired with others to commit the

following offenses against the United States: (1) to unlawfully, knowingly and intentionally import

five kilograms or more of a mixture and substance containing a detectable amount of cocaine into

the United States; and (2) to knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such substance would be unlawfully imported into the United States, all in violation of 21 U.S.C. §§ 952, 959, 960, 963, and 960(b)(1)(B)(ii) and 18 U.S.C. § 2.

The Defendant was arrested in Guatemala on April 26, 2011. The Defendant fought extradition until his eventual extradition to the United States on March 18, 2014.   The Defendant made his initial appearance on March 20, 2014 where he was ordered detained pending trial. A trial date was eventually set for January 5, 2015.

On August 18, 2014, the Defendant pleaded guilty to conspiracy to import five hundred (500) grams or more of cocaine into the United States, and to manufacture and distribute five hundred (500) grams or more of cocaine, intending and knowing that the cocaine will be unlawfully imported into the United States, all in violation 21 U.S.C. §§ 952, 959, 960 and 963, the lesser included offense and penalty provision of 21 U.S.C. § 960(b)(2) in Count One of the Third Superseding Indictment.   At the change of plea hearing, the Defendant contested facts previously agreed to in the signed Statement of Facts, specifically his own role within the organization, laying the majority of the responsibility at the hands of his sons.

**B.  <u>Defendant's Conduct</u>**

As a basis for requesting a Guidelines Sentence, the Government relies on the following information:

1.      **Relevant Conduct in the Presentence Report[1]**

During the course and in furtherance of the charged conspiracy, the Defendant was a leader of a drug trafficking organization ("DTO") which, from in or about March 1996 and continuing until at least November 2007, received, inventoried and stored large quantities of cocaine from Colombia that would later be illegally imported into Mexico, and ultimately, into the United States for further distribution.   PSR ¶¶ 15, 18.   Some of this cocaine would arrive in El Salvador via "go-fast" boats from Colombia and was then smuggled into Guatemala by land. Id.   Once in Guatemala, the cocaine was received, inventoried, stored and further distributed for importation into the United States on properties owned and/or utilized by the DTO, including the Defendant.   Id.   The DTO also used cocaine-laden aircraft that would land on clandestine airstrips located on or near properties owned and utilized by the DTO, including the Defendant. Id.   The DTO, including the Defendant, received, inventoried, stored, and further distributed the cocaine for importation into the United States.   Id.   The Defendant was paid a fee for each shipment of cocaine that members of the conspiracy received, stored, transported and sold on the Defendant's properties or those of his DTO co-conspirators during the conspiracy.   Id. Members of the DTO would then illegally sell the cocaine to Mexican drug traffickers in Guatemala knowing or intending that it would be further distributed to the United States.   Id.

During the course of his involvement in the conspiracy, several shipments of cocaine being distributed by the Defendant's DTO, or intended for the Defendant's DTO, were seized by law enforcement authorities of several different countries.   PSR ¶ 16.   The Defendant was aware that the cocaine was going to be illegally imported into the United States for further

---

[1] On September 19, 2014, the United States Probation Office filed its Presentence Report ("PSR").

distribution and he agreed that venue and jurisdiction lie with the United States.   PSR ¶ 17.

The Defendant was the leader of the DTO.   PSR ¶ 18.   Specifically, the Defendant directed where shipments of cocaine were stored in Guatemala for further distribution and directed the actions of others in the conspiracy, including his sons.   Id.   At other times during the charged Indictment timeframe, the Defendant allowed his sons to take the lead in planning and organizing the drug shipments; however, the Defendant continued to receive a portion of payments his sons and co-conspirators received during the course of the conspiracy.   Id.

In order to protect their multi-kilogram shipments of cocaine from being seized by law enforcement or stolen by other DTOs, the Defendant and co-conspirators paid foreign government officials to provide information to the DTO, in order to avoid detection or interference with the movement of the cocaine, and also to release co-conspirators from imprisonment.   PSR ¶ 19.   Indeed, one of the Government's witnesses provided the Defendant with $40,000 for bribes of public officials when the Defendant's son, Eliu, was detained in 1999, after he was found in possession of multiple firearms.   Id.   The Defendant's son was later released from custody.   Id.   Further, the Defendant employed an Army captain to "show that there was a level of security," and as a connection to safeguard shipments of cocaine.   Id.   The Defendant routinely encouraged members of the DTO to pay authorities in the area to protect the loads of cocaine, and law enforcement was used to escort the shipments.   Id.

During the course of the conspiracy, the Defendant and his co-conspirators were involved in laundering millions of dollars that constituted payment for, and proceeds from, cocaine trafficking.   PSR ¶ 20.   In April 2003, Guatemalan officials executed search warrants at two residences in Guatemala City and seized approximately $14 million dollars, weapons, and drug ledgers.   Id.   The ledgers included references to several members of the Defendant's DTO.   Id.

The payments reflected in the ledgers show that the various members of the DTO, including the Defendant's family members, made payments to or were paid for cocaine trafficking activities in United States currency.   Id.   Many of the payments were made during 2001. Additionally, the Defendant was investing money into legitimate business including a fruit plantation, importing and exporting goods, and cattle farming; however, the money for these "legitimate" businesses was coming from his sons and their illicit drug trafficking activities and proceeds.   Id.

The total amount of cocaine involved in this drug trafficking activity well exceeded 450 kilograms of cocaine.   PSR ¶ 21.

Moreover, the Defendant was the organizer and leader of this drug conspiracy, which involved five or more participants and was otherwise extensive.   PSR ¶ 23.   As previously noted, the Defendant was the leader of the DTO and provided direction and instruction to the other members of the conspiracy, including his sons.   Id.   The Defendant owned warehouses which he gifted to his sons and decided which son would receive specific shipments of cocaine. Id.   Toward the end of the conspiracy, the Defendant allowed his sons to take on leadership roles; however, the Defendant continued to receive money from loads of cocaine received by the DTO.   Id.

## 2.   Proffered Relevant Conduct

In addition to the information contained in the PSR as described above, the Government proffers the testimony of the following three witness, which the Government believes supports its position for a Guidelines sentence.[2]

---

[2] While the Government believes that an evidentiary hearing is unnecessary in this case based on the facts before the Court, the Government is prepared to call an agent to testify as to the proffered statements of these witnesses should the Court find that more evidence is needed at the sentencing hearing.   As the Court is aware, the Federal Rules of Evidence do not apply at sentencing, and therefore, the sentencing court can consider the testimony of an agent as to statements made by witnesses.   See FRE 1103(d)(3) (noting the FRE do not apply to sentencing proceedings); and

a.    Witness One

Witness One is a Guatemalan national who became involved in narcotics trafficking around approximately 1988.   Witness One entered a plea of guilty in the United States to charges stemming from an international drug trafficking conspiracy and is currently serving a term of incarceration.

Prior to becoming a narcotics trafficker, Witness One was a rancher and a farmer and it was in this capacity that Witness One met the Defendant.   Around 1988, Witness One was approached by a Guatemalan drug trafficker named Arnoldo Vargas (hereinafter "Vargas"). Vargas wanted to use the airplane landing strip on Witness One's land for the purpose of landing cocaine laden aircraft arriving from Colombia.   Witness One was offered $30,000 (U.S.) to expand the landing strip to accommodate the cocaine laden aircraft and was offered $15,000 to $20,000 (U.S.) for each cocaine load received on the property.   According to Witness One, Vargas had connections with the Guatemalan government and a portion of the landing strip was built by the roads department and a government official certified the landing strip upon its completion.

During these negotiations, Witness One learned from Vargas that Vargas had also formed a partnership with the Defendant in order to use the landing strip at the Defendant's ranch called "*Los Llanos*" to land cocaine laden aircraft arriving from Colombia.   However, Vargas told

---

see also United States v. Bras, 483 F.3d 103, 108, 376 U.S. App. D.C. 1 (D.C. Cir. 2007) (affirming the court's consideration of reliable hearsay testimony in a drug conspiracy prosecution).   The Sentencing Guidelines also provide that the Federal Rules of Evidence are inapplicable at sentencing. See U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."); see also 18 U.S.C. § 3661 ("No limitation shall be placed on the information … which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

Witness One that his (Vargas') military contacts had informed him that the Defendant's property was "hot," meaning that law enforcement were monitoring the activities at *Los Llanos*. Therefore, Vargas needed another location to land his aircraft to reduce the risk of adverse law enforcement action.   Witness One's property was located approximately one hour away from *Los Llanos*.

Vargas had a set of workers that received cocaine laden aircraft on both Witness One's property and on the Defendant's property.   Witness One received confirmation from these workers that they were also receiving cocaine laden aircraft on the Defendant's property and that the amounts received per shipment ranged from 800 to 1,000 kilograms of cocaine, which were similar to the amounts being received on Witness One's property.

In August 1990, Witness One was asked by Witness One's Colombian drug trafficking associates to protect a Colombian national who was in Guatemala.   According to Witness One, the Colombian national was murdered along with Witness One's brother-in-law shortly after Witness One began protecting him.   After their murder, the Defendant approached Witness One and told Witness One that the Colombians were blaming Witness One for the death of their associate.   The Defendant further explained that he had resolved the problem with the Colombians on behalf of Witness One, but that the Colombians wanted to meet with Witness One.   The Defendant arranged a meeting between Witness One and the Colombians.   Shortly after Witness One's conversation with the Defendant, two Colombians arrived at Witness One's home and proposed that Witness One form a partnership with them in the narcotics business. As a result of this intervention, Witness One felt indebted to the Defendant.

Beginning around 1995 or 1996, Haroldo, who is one of the Defendant's sons and also a co-defendant, asked Witness One to allow him (Haroldo) to work with Witness One in the drug

business.   Haroldo told Witness One that he (Haroldo) saw the Defendant having success in the drug trafficking business and that he (Haroldo) wanted to get involved as well.   However, Haroldo did not begin working for Witness One until approximately 1998 and continued working for Witness One until 1999.   According to Witness One, Haroldo received cocaine laden aircraft for Witness One, including aircraft that arrived at a ranch known as "*Las Canas*." Witness One paid Haroldo $100,000 (U.S.) per shipment that he received on behalf of Witness One.

Around 2000 or 2001 during a discussion that Witness One had with Haroldo at a farm in Izabal, Guatemala, Witness One learned from Haroldo that Eliu, another one of the Defendant's sons, was the one supplying the Lorenzana family members, including the Defendant, with cocaine.   According to Haroldo, Eliu was receiving cocaine shipments from Witness Two. Haroldo explained to Witness One that the Defendant had just received cocaine from Eliu.

On one occasion in December of 2002, Witness One used *Las Canas* to send an aircraft containing 242 kilograms of cocaine from Guatemala to Mexico and paid Haroldo $60,000 (U.S.) in order to do so.   During this shipment Haroldo and Witness One discussed the arrival of a shipment of cocaine via a maritime vessel that the Defendant's other son, Eliu, had just received.   Haroldo explained again that Eliu was the one currently supplying all of the family members, including the Defendant, with cocaine.   Haroldo told Witness One that Eliu gave the Defendant 200 kilograms of cocaine from the shipment that had just arrived via maritime vessel.

Haroldo also explained to Witness One that a property called "*La Calera*" was used to store and divide up cocaine shipments.   According to Haroldo, the property once belonged to the Defendant, but that the Defendant transferred ownership of the property to Haroldo.

According the Witness One, the Defendant knew that Haroldo was working with Witness

8

One.   Around 2000 or 2001, Haroldo wanted to travel to Colombia for the purpose of negotiating drug shipments directly with Colombian sources of supply.   The Defendant approached Witness One and asked Witness One to speak with Haroldo in an effort to discourage Haroldo from going to Colombia.   The Defendant explained to Witness One that in Guatemala he (the Defendant) could protect Haroldo because the Defendant had the power to deal with law enforcement.   However, the Defendant explained to Witness One that Haroldo would be vulnerable in Colombia because they did not have the power to deal with law enforcement there.

Witness One is aware that the Defendant was trafficking drugs with Arnoldo Vargas before Witness One became involved in 1988.   Witness One is aware of five to six airplane shipments received on the Defendant's properties between 1989 and 1990 that totaled approximately one ton of cocaine.   The last dealings that Witness One had with a member of the DTO was the shipment that Witness One sent to Mexico from *Las Canas* with the help of Haroldo in 2002.   The last time that Witness One saw the Defendant was in 2001.

b.   Witness Two

Witness Two plead guilty to drug trafficking offenses in the United States.   Witness Two grew up with the Lorenzana family in Guatemala.   Witness Two worked for the Defendant and his DTO from approximately 1995 to approximately 2002.   Witness Two's role was to coordinate loads of cocaine being transported from Colombian DTOs through Guatemala to Mexico.   These loads of cocaine were eventually illegally brought into the United States for further distribution.   While coordinating these loads of cocaine, Witness Two worked with the Defendant and his sons and co-defendants, Haroldo, Eliu and Waldemar Jr., to transport and store the cocaine in Guatemala.

9

Witness Two initially began trafficking cocaine from Colombia through Guatemala with another drug trafficking family, in approximately 1994.   However, in approximately 1995, during Easter week, Witness Two met with the Defendant, Haroldo Lorenzana, and a major in the Guatemalan Army at the Defendant's ranch.   Prior to the meeting, Witness Two had spoken with Haroldo about the drug trafficking activities that Witness Two was conducting with the other family and they agreed to conduct another meeting to further discuss Witness Two's illegal activities.   At the meeting at the Defendant's property, Witness Two explained to Haroldo, the Defendant and the Guatemalan Army major how Witness Two worked with the other family to traffic cocaine through Guatemala.   The Defendant told Witness Two to coordinate with Haroldo to begin trafficking cocaine through the Lorenzana properties if there was a trusted source of supply for cocaine.   The Defendant, Haroldo and Witness Two all agreed to move forward with their drug trafficking activities.

Approximately two months later, Witness Two spoke with Haroldo and they discussed working together to traffic cocaine.   Haroldo told Witness Two that he had to get authorization from the Defendant.   Subsequently, Witness Two met with the Defendant and Haroldo at the Defendant's property in La Reforma, Guatemala and they discussed the logistics of trafficking cocaine through Guatemala.   Specifically, they discussed having cocaine-laden aircraft land on airstrips located on properties owned or controlled by the Lorenzanas, which would then be stored in warehouses owned and operated by the Lorenzana family.   While Witness Two and Haroldo were directly involved in the planning and logistics of the proposed drug trafficking operation, it was clear to Witness Two through Witness Two's discussions with Haroldo and the Defendant that the Defendant authorized the work to be done.

Approximately one month later, Haroldo received the first load of cocaine via airplane.

10

Witness Two worked with Haroldo (with the Defendant's authorization) to traffic cocaine through the Lorenzana properties in Guatemala.   They averaged approximately one to two cocaine loads per month from 1995–1999 with the loads consisting of approximately 300 to 400 kilograms of cocaine per single-engine airplane.

Witness Two is familiar with the Colombian, Guatemalan and Mexican prices of cocaine from 1995 to 2003.   Witness Two quoted prices of cocaine sold in Guatemala from 1995 to 1998 at $7,500 to $9,500 per kilogram; 1998 to 2000 at $9,500 to $11,000 per kilogram; and 2000 to 2003 at $11,000 to $13,000 per kilogram.   The Lorenzanas' charged Witness Two approximately 10% for transportation, security, and use of their airstrips.   Furthermore, all money paid to or by the Lorenzanas was in United States currency and the loads of cocaine handled by the Lorenzanas were ultimately sent to the United States.   Additionally, Witness Two estimates that the Lorenzanas conservatively would make approximately $1 million per 1,000 kilos of cocaine the Lorenzana DTO trafficked through Guatemala.

Witness Two is aware that *"El Llano"* was the term used to describe several acres of property that were controlled by the Lorenzana family and DTO in Guatemala.   Witness Two is also aware that *El Llano* is comprised of agricultural fields and warehouses and is located in La Reforma, Guatemala along the railroad tracks.   Further, Witness Two worked with the Lorenzana DTO to deliver cocaine from Colombia via aircraft and watercraft that was subsequently stockpiled at a warehouse facility located at *El Llano* prior to its delivery to the Mexican cocaine owners.   Witness Two is aware that Eliu (one of the Defendant's sons) runs *El Llano* for the Lorenzana DTO.

According to Witness Two, *Las Canas* is the name of a property containing an airstrip controlled by the Defendant's DTO that was used by the DTO to receive cocaine laden-aircraft.

Also according to Witness Two, the land on which the airstrip is located and the surrounding countryside was once completely owned by the Defendant, but was subsequently transferred to Waldemar Lorenzana-Cordon (one of the Defendant's sons).   Additionally, Witness Two knows that the portion of *Las Canas* containing the landing strip was eventually sold to individuals associated with the Coca-Cola Company, but that the Defendant's DTO continued to use the landing strip to receive cocaine-laden aircraft without the knowledge of its new owners.   The Defendant made arrangements with the property manager at *Las Canas* in order to continue using the landing strip to receive cocaine-laden aircraft.   When cocaine-laden aircraft were scheduled to arrive in Guatemala, Witness Two would alert the Defendant of the need to use *Las Canas* to receive a pending shipment.   The Defendant would speak with the property manager and then give Witness Two a time-frame that *Las Canas* would be available for the DTO's use.

Further, the Defendant himself directed Witness Two as to which airstrip and when Witness Two should direct an aircraft to land.   If Witness Two objected to the Defendant's instruction because of the proximity of the airstrip to police or military, the Defendant would respond "Leave it to me.", which Witness Two interpreted to mean that the Defendant would compensate the police or military not to intercept the aircraft.   Witness Two made a point of informing the Defendant as to when airplanes were scheduled to arrive, and the Defendant would often advise Witness Two to wait a few days or land at an alternate airstrip.   Witness Two understood this to mean that the Defendant had connections with the military and police who provided inside information to the Defendant to avoid adverse law enforcement actions.

From approximately 1999 to 2002, Witness Two coordinated cocaine shipments for the DTO containing approximately 500 to 600 kilograms of cocaine every two months on small planes from Colombia to Guatemala.   The cocaine was packaged in 25 kilogram bundles that

were further contained within white burlap bags.   The planes delivered the cocaine to various airstrips on properties controlled by the Lorenzana DTO.

From approximately 1999 to 2001, the DTO also received shipments of cocaine in El Salvador via go-fast boats that left from Colombia and arrived off of the Pacific Coast of El Salvador.   These boats were met on the waters of the Pacific Ocean by another set of go-fast boats that launched from El Salvador.   The cocaine was then transferred to the El Salvadoran go-fast boats, which then brought the cocaine to land in El Salvador.   There were approximately seven to eight loads of cocaine delivered utilizing the go-fast boat method, ranging in average size from 1,500 to 2,500 kilograms of cocaine.   According to Witness Two, once the cocaine was received in El Salvador, it was inventoried and then transported to Guatemala on banana trucks.   Witness Two coordinated the arrival of the loads at the Lorenzana warehouses.   Once the loads of cocaine arrived at the warehouses, they were inventoried by Witness Two, along with Witness Three, Haroldo, Eliu and Waldemar Jr.   The cocaine was eventually sold to Mexican traffickers for importation into the United States.

Throughout the course of Witness Two's dealings with the Lorenzana DTO, Witness Two worked with Haroldo, Eliu and Waldemar Jr. coordinating the receipt and storage of cocaine loads, all with the authorization of the Defendant.   In fact, regarding the new maritime route through El Salvador, the Defendant was the only person who authorized this new method. Witness Two directly discussed this new route with the Defendant.   The Defendant also decided which son was to receive the load of cocaine and to which property Witness Two was to coordinate delivery of the cocaine.   Witness Two will explain that Haroldo initially received the loads of cocaine at a property known as "*La Calera*," but that the trucks had difficulty driving up the roads that led to this property.   Furthermore, the trucks stood out in the area surrounding *La*

*Calera*.   Therefore, the Defendant made the decision to start using Eliu's property, known as *El Llano*.   The Defendant and Witness Two went to *El Llano* to inspect the property and determine its suitability for receiving and storing loads of cocaine.   The Defendant showed Witness Two structures that had been used to dry out tobacco as possible locations to receive and store the cocaine.   Witness Two stated that these structures would need to be modified.   The Defendant told Witness Two that he (the Defendant) would make whatever modifications necessary.   In fact, the Defendant took Witness Two to the property and the Defendant personally inspected the modification.   Witness Two also mentioned that the Defendant was never present, that Witness Two knew of, at the properties when the cocaine shipments were being delivered, always making sure to be at another location.

While working with the Lorenzana DTO, Witness Two never paid the Defendant directly. Rather, Witness Two paid Haroldo, Eliu, or Waldemar, Jr., depending on which son was receiving and storing that load of cocaine.   However, Witness Two knew that the Defendant received payments for the shipments that Witness Two coordinated with Haroldo, Eliu and Waldemar, Jr.   When negotiating prices for using the Lorenzana airstrips, and the Lorenzana transportation and storage services with Witness Two, Haroldo, Eliu and Waldemar, Jr. often stated that a big portion was going to the Defendant.   For example, in 1995 or 1996, if Witness Two and the Lorenzanas were receiving an aircraft that transported cocaine, the Lorenzanas would get 25 kilograms of cocaine for receiving the aircraft on one of their properties.   At $6,000 per kilogram, the 25 kilograms of cocaine amounted to a payment of $150,000 (U.S.). Haroldo and Eliu told Witness Two that they were only keeping $15,000 to $20,000 and that the Defendant took the rest.   They would often ask that Witness Two defer payment and say to Witness Two, "Don't pay us now because the 'Old Man' will take some."   Furthermore,

Witness Two knew that the Defendant's sons had to pay a large portion of their fees to the Defendant because they would, at times, try to receive cocaine shipments from Witness Two without the Defendant's knowledge in order to avoid having to pay the Defendant.   Haroldo would also ask Witness Two not to tell the Defendant about bigger planes that were coming through with cocaine when the Defendant was not present, in order to hide some of the commission from the Defendant.

Not only did the Lorenzanas charge a percentage of the cocaine loads for use of their airstrips, transport of the cocaine, security, and storage of the cocaine, they also received a portion of the loads to sell to Guatemalan and Mexican traffickers.   Witness Two is also aware that the Lorenzanas had local customers and sold locally from 1999-2003 at a much higher rate than they paid for the cocaine.   Witness Two also knows that the Lorenzanas laundered their drug proceeds in "legitimate" business ventures in Guatemala.   Namely, the Defendant invested in limes, real estate and cattle with the proceeds from his drug trafficking.   Additionally, the Defendant contacted Witness Two in approximately 2002 to ask for Witness Two's advice as to how to invest his drug proceeds in legal ventures, as a way to conceal and therefore launder the drug proceeds.

Additionally, the Defendant paid bribes as part of his drug trafficking operation.   For example, Witness Two knows of an incident in which Eliu was arrested in 1999 in La Maquina, Guatemala with weapons while for waiting for a load of cocaine to be delivered.   The Defendant bribed Guatemalan police to secure Eliu's release from custody, with the help of Witness Two who gave the Defendant approximately $40,000 for the payment to the police.   The Defendant told Witness Two that he (the Defendant) was going to take care of it, and picked Eliu up from the jail.

Further, the Lorenzana DTO would use local law enforcement officials to help protect the drugs from being stolen or seized in Guatemala; and on occasion, the DTO used local law enforcement for the actual transport of cocaine shipments.   Haroldo and Eliu would often brag to Witness Two that the police were on their side.   According to Witness Two, the Defendant was the one that established and maintained relations with Guatemalan law enforcement to further the organizations drug trafficking activities, including the Guatemalan Army major who was present at the first meeting that Witness Two had with the Defendant in 1995.

The Defendant began trafficking cocaine prior to working with Witness Two.   In 1995 or 1996, Witness Two worked with a bulldozer operator to build an airstrip on one of Haroldo's properties for the Lorenzana DTO. The bulldozer operator told Witness Two that the bulldozer operator had previously built an airstrip for the Defendant and Witness One.   Furthermore, the Defendant and the Lorenzana DTO continued to traffic cocaine well after their involvement with Witness Two.   Witness Two learned that the Lorenzanas began to negotiate directly with the Colombian DTOs in approximately 2002 and continued doing so after Witness Two stopped working with the Lorenzana DTO that same year.

Witness Two is also aware that the Defendant laundered the proceeds from his drug trafficking activities into legitimate business ventures such as cattle, real estate and limes, as a way to conceal the illicit nature of the drug proceeds.

c.   Witness Three

Witness Three is a former Guatemalan trafficker currently jailed in the United States for his/her participation in the instant conspiracy.

Witness Three grew up in Guatemala with the Defendant's sons, Haroldo, Eliu, and Waldemar Jr.   Prior to 1999, Witness Three worked for Haroldo, serving as a lookout while

16

Haroldo was receiving cocaine shipments at various locations in Guatemala.    From the late 1990s to 2003, Witness Three worked directly with the Lorenzana family and Witness Two, who was the source of supply delivering cocaine to the Lorenzana properties in the Zacapa region of Guatemala.

Witness Three's primary function within the DTO was that of an accountant for the DTO's trafficking activities, and Witness Three kept a series of ledgers noting the distributions and payments of cocaine arriving in Guatemala, a significant portion of which was stored on the Lorenzana properties during the timeframe of the conspiracy.    Witness Three was also responsible for arranging meetings with the Lorenzana sons to coordinate the delivery and storage of cocaine arriving in Zacapa, which was stored at the Lorenzanas' warehouses, as well as coordinating the delivery and payments of cocaine proceeds. Witness Three was also authorized by Witness Two to release cocaine for distribution upon receiving payment from Witness Two's customers.    Witness Three was also responsible for transporting the drug proceeds from the rural areas of Guatemala to Guatemala City, Guatemala.

In the early 2000s, the DTO members coordinated the delivery of cocaine into Guatemala via go-fast boats arriving to various locations in El Salvador.    The cocaine was then loaded onto tractor trailers and transported across the border into Guatemala and delivered to the Lorenzana properties, where it was unloaded and stored in warehouses owned by the Lorenzanas.    The Lorenzanas then sold the cocaine to other DTO representatives who removed it from the Lorenzana properties.    On one initial occasion in early 2000, a cocaine shipment that had via boat to El Salvador was en route to Guatemala when its previously-negotiated storage location fell through.    According to Witness Three, Witness Two directed Witness Three to approach the Defendant's son, Waldemar Jr., to arrange a meeting between the Witness Two,

Witness Three, and Waldemar Jr. to discuss whether the cocaine shipment could be diverted to a warehouse located on Waldemar Jr.'s property, "*La Finquita*," a property that Waldemar Jr. was given by the Defendant.    The parties reached an initial agreement in principle about storing the narcotics on Waldemar Jr.'s property, agreeing that the cocaine supplier would pay $150 in United States currency for each kilogram of cocaine delivered to the property.    Nonetheless, prior to finalizing the agreement, Waldemar Jr. announced that he needed to speak with his father, the Defendant, before final arrangements could be made, which Witness Three understood to mean finalizing the details and seeking the Defendant's ultimate approval. Approximately 1,500 to 1,700 kilograms of cocaine were subsequently successfully delivered to the property the following day, marking the initial shipment of numerous cocaine deliveries from the El Salvador operation under the same terms discussed by Waldemar Jr., Witness Two, and Witness Three.

The Defendant was later concerned about the increase in activity associated with the cocaine deliveries to Waldemar Jr.'s properties that could attract law enforcement attention. The Defendant was concerned that the presence of tractor trailers, cars and trucks accompanying the arriving shipments would draw increased attention in a small village with few cars of its own. After the first unloading at *La Finquita* owned by Waldemar Jr. in early 2000, Witness Three was present when the Defendant reported that there was too much activity in the village. Subsequently, the delivery of the cocaine shifted to properties owned by the Defendant's two other sons, *El Llano,* owned by Eliu, and *La Calera*, owned by Haroldo, but the cocaine continued to also be stored at Waldemar Jr.'s after being unloaded.    During this time period, Witness Three saw improvements being made to *El Llano*, Eliu Lorenzana's property – a property given to him (Eliu) by the Defendant – that would better accommodate the tractor

trailers' arrival, including the enlargement of the gate at the property front, as well as the enlargement of Eliu's warehouse in order to allow the trailers to fully pull into the structure before commencing with unloading the cocaine.   According to Witness Three, from early 2000 until approximately the end of 2002 to early 2003, the El Salvador operation delivered roughly 1,500 to 1,700 kilograms of cocaine approximately twice per month to Lorenzana properties. For each of these deliveries, the same $150/kilogram arrangement that governed the first delivery was in effect until the end of the El Salvador cocaine operation.

As discussed previously, the Lorenzanas were also receiving cocaine shipments that were delivered to airstrips either on their properties directly or on properties over which the Defendant and his DTO were able to coordinate and control.   Witness Three was present for arrival of an aircraft to a landing strip located at *Las Canas* a property owned by Waldemar Jr., that was coordinated with the Defendant's third son, Haroldo.   According to Witness Three, the shipment included approximately 1,000 to 1,500 kilograms of cocaine, which were unloaded and further transported by boat over a lake abutting the property to trucks waiting at the direction of Witness Two.   According to Witness Three, the Lorenzanas received aerial shipments approximately once a month from approximately the year 2000 to 2002.   Each arriving shipment would include approximately 1,000 kilograms of cocaine.   Unlike the El Salvador operation, in exchange for receiving the cocaine via the aerial method, the Lorenzanas were permitted to invest in each load and they also received three to four percent of the total cocaine shipment as payment for their services.   The Lorenzanas were subsequently responsible for selling and distributing their portion of the cocaine.

While Witness Three never saw the Defendant at any delivery location while the cocaine was actually arriving, Witness Three would observe that the Lorenzana sons, Witness Two, and

other co-conspirators in charge of receiving the incoming shipments of cocaine would often gather at one of the Defendant's sons' residences for a group meal following the cocaine's arrival and storage.   The Defendant would nearly always attend these gatherings, which Three believed demonstrated that the Defendant was aware of the arrival of these cocaine shipments and maintained control of all of the family's drug trafficking activities.   Witness Three also believed that the Defendant's presence implied that the Defendant was to receive a portion of the profits gained through the DTO's efforts, as these dinner meetings served as a means for facilitating the distribution of the proceeds of the organization's ventures.

During these meetings, the Defendant would always take Witness Two aside to discuss drug trafficking issues and direct Witness Two to proceed with caution in in future activities and shipments.   Witness Two told Witness Three the substance of these conversations, including how the Defendant told Witness Two that the family was making money, but that the Defendant was always cautious about drawing too much attention to their activities at the risk of attracting the scrutiny of law enforcement.   It was also during these meetings that Witness Three reports the Defendant announcing "Do whatever the fuck you want, because nothing is going to happen here."   According to Witness Three, the Defendant acted as if he owned the town and the townspeople and would often act with impunity, announcing that he was friends with military chiefs and the police.   According to Witness Three, the Defendant's own sons would often attempt to coordinate drug transactions behind the Defendant's back, which Witness Three believes was so that the sons could avoid paying the Defendant for the transaction.

On one occasion in early 2000 after approximately three cocaine shipments had been successfully delivered to the Lorenzana properties, the Lorenzana sons approached Witness Three about releasing 100 kilograms of cocaine on credit.   The sons approached Witness Three

on approximately three occasions with the same demand, and on each occasion, Witness Three, who was authorized by Witness Two to release the cocaine only upon payment, refused.   The Defendant's sons were enraged by Witness Three's refusal to do so.

As a result of these events, Witness Three believes that the Defendant's sons convinced the Defendant to have Witness Three murdered.   Shortly after Witness Three's final refusal to release the cocaine without payment, Witness Two picked up Witness Three and drove to the Defendant's residence in La Reforma, Guatemala.   Present at the Defendant's residence was the Defendant, his three sons, Witness Two, Witness Three, and two additional co-conspirators. Witness Two confronted the Defendant with information that Witness Two had learned that the Defendant wanted to have Witness Three killed.   The Defendant denied the accusation. Witness Two then called in the co-conspirators and asked one of them what they had heard about the Defendant and Witness Two.   This person told the group that he had heard that the Defendant wanted to kill Witness Three.   The Defendant initially denied it again, but with the witness firmly repeated the accusation, the Defendant then acknowledged the threat and said it was because he (the Defendant) was angry with Witness Three.

The Defendant was also responsible for bribing officials to facilitate the continued operation the DTO's trafficking activities.   Specifically, in 1999, the Defendant's two sons, Eliu and Obaldino Lorenzana were arrested for weapons possession when they were caught by local law enforcement with the weapons in the secret compartment of a truck that belonged to Witness Two while Eliu and Obaldino were waiting to receive a maritime shipment of cocaine arriving on the Pacific coast of Guatemala.   According to Witness Three, Waldemar Jr. gave the Defendant $50,000 to be used as law enforcement bribes to secure their release.

The Defendant's brother, also told Witness Three that the Defendant introduced him to drug trafficking.

### III.    A GUIDELINES SENTENCE IS REASONABLE

#### A.    The PSR's Guidelines Calculations

On September 19, 2014, the United States Probation Office filed its Presentence Investigation Report ("PSR").   In the PSR, the Probation Office correctly calculated a base offense level of 38, finding the Defendant accountable for over 450 kilograms of cocaine pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1).   PSR ¶¶ 29, 70.   The PSR applied two sentencing enhancements: the first enhancement for use of an aircraft pursuant to U.S.S.G. § 2D1.1(b)(2)(A).   PSR ¶ 30.   This enhancement was properly applied based on the use of aircraft to transport cocaine loads from Colombian to Guatemala by the Defendant's DTO.   PSR ¶ 15.   Further, these cocaine-laden aircraft subsequently landed on airstrips controlled by the Defendant and his DTO in Guatemala.   Id.

Second, the PSR applied a four-level adjustment for a managerial or supervisory role in the offense.   PSR ¶ 32.   The PSR accurately found that the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, therefore, four levels are added. USSG §3B1.1(a).   Id.   The PSR correctly detailed how the Defendant was the leader of the DTO and provided direction and instruction to the other members of the conspiracy, including his sons.   Id.   Further, the Defendant owned warehouses which he gifted to his sons and decided which son would receive specific shipments of cocaine. Id.   Toward the end of the conspiracy, the Defendant allowed his sons to take on leadership roles; however, the Defendant continued to receive money from each load of cocaine received by the DTO.   Id.   Accordingly, the PSR determined that a four-level adjustment is warranted,

22

pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 3B1.1(a).

Finally, the PSR applied a three-level offense level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and (b).   PSR ¶¶ 36, 37.   The PSR pertaining to this Defendant estimates his Adjusted Offense Level under the U.S.S.G. to be 41, resulting in a sentencing range of 324 to 405 months.   PSR ¶¶ 38, 42, 67, 68.   As set forth below, the Government concurs with the Probation Department and submits that a Guidelines sentence is reasonable and appropriate in this case.

### B.   The Manager/Supervisor Role Enhancement Is Warranted

Section 3B1.1 of the Sentencing Guidelines provides that the sentencing court should increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a).   As described in the comments to the Guidelines, to qualify for an adjustment under this section, "the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants."   Id. at Application Note 2.   The Guidelines further elucidate criteria to determine a Defendants role:   "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."   Id. at Application Note 4.   Courts within this Circuit have often cited the factors identified in Application Note 4, particularly emphasizing that "[t]he exercise of decision making authority, recruitment, and a claimed right to a larger share of the proceeds are prominent among the

factors that the commentary to the Guidelines indicates should be considered." United States v. Wilson, 240 F.3d 39, 46-47 (D.C. Cir. 2001) (declining to engage in an "exegesis of the concept of control" and instead emphasizing decision-making authority, recruitment and claim over larger share of proceeds); United States v. Brodie, 524 F.3d 259, 270 (D.C. Cir. 2008).   For instance, in United States v. Brodie, the District of Columbia Circuit placed particular emphasis on the fact that the defendant "recruited individuals with specialized skills to facilitate his scheme, … coordinated the group's efforts and directed them in the performance of their respective tasks, … [and] paid the other participants flat fees for their services … [while keeping] the 'fruits of the crime' for himself," when upholding the District Court's determination on the issue of leadership.   Brodie, 524 F.3d at 270.

There is sufficient evidence to support the PSR's factual findings for a four-level role adjustment in this case.   As described in the PSR and in the proffered testimony of the witnesses described above, the Defendant was the organizer and leader of the Lorenzana DTO, a sophisticated and extensive international drug trafficking organization comprised of more than five individuals, including Witness Two, Witness Three and the Defendant's three sons, among others.   The Defendant also gave orders and instructions to his sons and others as to where loads of cocaine should be received, inventoried and stored, as well as when they should be received so as to avoid law enforcement detection.   Even when the Defendant took a less forward role in this conspiracy, he continued exercise control over the DTO by taking a large percentage of the profits either in the form of U.S. currency or cocaine that were received by the Lorenzana DTO, indicating his managerial role throughout the course of the conspiracy.   Put quite simply, the Defendant was the patriarch of the family and this role extended into the extensive international drug trafficking conspiracy.   He began the drug trafficking activities in this family, and slowly

but surely introduced his sons into the "family business."

Further, this was a sophisticated operation.   The Defendant's DTO was trafficking massive quantities of cocaine from Colombia to Guatemala through various locations. Additionally, the Defendant's DTO utilized planes, maritime assets, trucks, landing strips, and warehouse storage facilities.   The large quantities of cocaine that the Defendant and his DTO successfully trafficked from Colombia to Guatemala were then transported into Mexico and then into the U.S. for further distribution.   This went on in tonnage quantities for decades.

The DTO was also extensive in that it was necessary to have an accountant keep all of their drug and financial transactions straight.   The DTO also involved corrupt law enforcement and military officials to help protect their activities and people for seizure and arrest.

Lastly, by the Defendant's own admission to co-conspirators, his power and control was so extensive over the area he operated in, that he told members of his DTO not to worry about getting into trouble given the influence he had over law enforcement and military in the area. Moreover, he and the other senior DTO members made so much money they had to come up with creative, sophisticated ways to conceal and launder their drug proceeds into "legitimate" businesses to keep it from being detected and to spend it all.

Therefore, the four-level role adjustment is clearly warranted and should be applied in this case.

**C.**     **The Aircraft Enhancement is Applicable**

Section 2D1.1(b)(2)(A) of the Sentencing Guidelines provides that the sentencing court should increase a defendant's offense level by two levels "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance

. . ."   The evidence clearly supports the application of the enhancement for use of an aircraft pursuant to U.S.S.G. §2D1.1(b)(2)(A).   First, the Defendant admitted that his drug trafficking organization utilized airplanes throughout the course of their trafficking loads of cocaine from Colombia Guatemala.   See Statement of Facts signed by the Defendant and filed on August 18, 2014.[3]   Additionally, as noted above, all three witnesses that the Government would have called at trial detailed above, were aware that aircraft were used as part of the drug trafficking scheme that the Defendant participated in and orchestrated.   See United States v. Bethancourt, 65 F.3d 1074, 1080-1081 (3rd Cir. 1995) (affirming the application of the aircraft enhancement despite the defendant's argument that it was not foreseeable or in furtherance of the conspiracy.) Further, the cocaine-laden aircraft used in this conspiracy landed at airstrips owned or controlled by the Defendant and his DTO.   Therefore, the application of this enhancement is clearly supported by both the witness testimony as well as the Defendant's own Statement of Facts that were part of the Plea Agreement.

### D.   A Guidelines Sentence is Reasonable and Appropriate

The Sentencing Guidelines still provide strong guidance to the Court in light of United States v. Booker, 543 U.S. 220 (2005).   Although Booker held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. Booker, 543 U.S. at 264.   As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" - that "should be the starting point and the initial benchmark."   Gall v. United States, 552 U.S. 38, 39, (2007).

---

[3]   In the Objections filed by defense counsel on October 3, 2014, it states "Mr. Lorenzana submits on the factual proffer that was part of the plea agreement with the Government."

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)). Gall v. United States, 552 U.S. at 50.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." Gall v. United States, 552 U.S. at 50, n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "[t]he sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." Rita v. United States, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive

empirical evidence derived from the review of thousands of individual sentencing decisions,"

Gall v. United States, 552 U.S. at 38, 46.   To the extent a sentencing court varies from the

Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the

justification is sufficiently compelling to support the degree of the variance."   Id. at 51.

A court should use the version of the Guidelines Manual in effect at the time of

sentencing unless retroactive application of that version would result in a more severe penalty

than would result from applying the version in effect at the time of the offense.   Peugh v. United

States, 133 S. Ct. 2072, 2078, 2082-83 (2013) (recognizing an ex post facto violation when a

defendant is sentenced under Guidelines providing a higher range than the Guidelines in effect at

the time of the offense).[4]

For the reasons stated below, the sentencing factors found in the PSR should be applied

in this case.   Namely, the enhancement for leader/supervisor and the use of an aircraft should be

applied based on the evidence presented through the PSR, the statement of facts, and the

proffered testimony of three witnesses above.   Furthermore, the statutory factors under 18

U.S.C. § 3553(a) warrant a guideline sentence of 324 to 405 months in this case.   Lastly, any

mitigating factors found in the PSR do not warrant a variance or departure from the applicable

guideline range.   Therefore, a sentence between 324 to 405 months is appropriate in this case.

1.     **Nature and Circumstances of the Offense, and Need for the Sentence
to Reflect the Severity of the Offense**

The Defendant committed serious crimes, over an extended period of time, against the

---

[4]   The Government believes that the 2009 U.S.S.G. are applicable in this case and accordingly has not applied specific offense characteristics such as bribing a public official (U.S.S.G. § 2D1.1(b)(1)) or maintaining a premises for the purpose of distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)).   However, the Government believes that defendant's conduct related to these specific offense characteristics qualifies as relevant conduct and plans to introduce evidence of such at sentencing.   Further, this conduct is relevant for the purposes of the Court evaluating 3553(a) factors.

United States by controlling an extensive international DTO based in Guatemala that was responsible for transporting multi-ton quantities of cocaine from Colombia to Central American countries and Mexico for ultimate importation into the United States.   The Defendant's DTO was expansive utilizing aircraft, maritime vessels and various forms of ground transportation methods to traffic multi-ton quantities of cocaine in multiple countries.   The Defendant's trafficking of cocaine spanned several decades and involved mass quantities of cocaine.   Indeed, the amount of cocaine that the Defendant is responsible for conspiring to import into the United States, well exceeds the highest offense level under the Sentencing Guidelines.   This is a testament to the extremely serious nature of the Defendant's criminal conduct.

Additionally, the proffered testimony of the Government's witnesses establishes that as the patriarch of the Lorenzana family and the patriarch of DTO, members of the organization rarely did anything significantly impacting the DTO without the Defendant's authorization. Further, the Defendant was the first in his family to begin trafficking cocaine, and then brought his sons up in the "family business."   It is therefore the Defendant, who as the head of this DTO, is truly responsible for these large quantities of cocaine being illegally trafficked into the United States by the Defendant's DTO.

As the Court is well aware, cocaine is an extremely dangerous and destructive illegal street drug.   Cocaine abuse has devastated communities in the United States, Colombia, and elsewhere, ruining lives, splitting families apart, inflicting violence on innocent by-standers, and wreaking havoc on innocent family members and children.   It's also a very destabilizing and corruptive force in countries throughout the region that don't have strong enough law enforcement institutions to combat it, such as in Guatemala and Mexico, further adding to the destructive nature of the crime.   Its social costs have been enormous.   The Defendant's offense

involved aiding and abetting individuals in Colombia and elsewhere who imported these drugs into the United States and it also involved the Defendant's direct participation in the importation of these drugs into the United States.

Furthermore, the Defendant's conduct is not fully encompassed by the sentencing enhancements already discussed.   As noted throughout the proffered testimony from the Government's witnesses, the Defendant and other members of his DTO consistently bribed public officials to provide protection and security for loads of cocaine being trafficked in Guatemala and to avoid criminal punishment for their actions, such as the Defendant's payment of a bribe to secure the release of his son, and co-defendant, Eliu from custody in 1999.   As the head of a large and powerful drug trafficking organization, the Defendant's bribery most likely contributed to the public corruption that plagues Guatemala to this day.   Additionally, the proffered testimony also demonstrates that the Defendant and members of the DTO clearly maintained several warehouses for the sole purpose of distributing and trafficking cocaine.[5] This proffered evidence would clearly qualify for two additional two-point enhancements under the current Sentencing Guidelines pursuant to U.S.S.G. § 2D1.1(b)(1) and (b)(12).   This would increase the Defendant's total offense level to a level 45 and guidelines range of life.   The Government acknowledges that these enhancements should not be applied in this case as the 2009 Guidelines are the controlling guidelines in this case.   However, the inclusion of these enhancements in the current Sentencing Guidelines demonstrates how seriously the Sentencing Commission views conduct such as the Defendant's in this case.   Thus, the serious nature and

---

[5] As noted above, the Government believes that the 2009 U.S.S.G. are applicable in this case and accordingly has not applied specific offense characteristics such as bribing a public official (U.S.S.G. § 2D1.1(b)(1)) or maintaining a premises for the purpose of distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)).   While these sentencing enhancement cannot be applied in this case, the Defendant's activities throughout the course of the conspiracy highlight the serious nature of this offense.

circumstances of this offense necessitates a sentence of 324 to 405 months.

### 2.      Adequate Deterrence

Given the adverse impact that drug trafficking has on society and governments, it is important that the Court impose a sentence that deters others from undermining the rule of law. Further, while this prosecution has incapacitated some of the narcotics trafficking through Guatemala, importation of controlled substances from Guatemala and the region into the United States still occurs.   The recommended sentence would provide a critical general deterrence to other narcotics trafficking leaders that their participation in narcotics importation into the United States will result in substantial sentences.

### 3.      Protect the Public from Further Crimes of the Defendant

Prior to his arrest, the Defendant was a member of a DTO responsible for trafficking significant quantities of cocaine to the United States for several years.   By pleading guilty, the Defendant has arguably accepted responsibility for his criminal conduct, he will serve an appropriate prison sentence, and as a convicted felon, he will be deported to Guatemala.   The Defendant has indicated his desire to return to home.   Accordingly, with a significant sentence to deter further criminal activity, it would be expected that once there, the Defendant would not constitute a continuing threat to the public.   However, it should be noted that the underlying conduct of the Defendant's offense was committed while the Defendant resided in Guatemala, maintained significant influence there over public officials, and members of his family and DTO still reside in Guatemala.

### 4.      The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) articulates "the need to avoid <u>unwarranted</u> sentence disparities among defendants <u>with similar records</u> who have been found guilty of <u>similar conduct</u>."   18 U.S.C. §

31

3553(a)(6) (emphasis added).    By its terms, the statute requires a specific evaluation of the

compared defendants' records and conduct.    When determining whether a sentence creates an

unwarranted disparity, the Court should also consider, <u>inter alia</u>, a defendant's acceptance of

responsibility, the nature and extent of a defendant's participation in the criminal activity, a

defendant's criminal history, and whether and to what extent a defendant cooperated.    <u>See</u>, <u>e.g.</u>,

<u>United States v. Mejia</u>, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in

sentences was "entirely explained" by co-defendant's acceptance of responsibility and thus any

disparity resulting from defendant's "harsher" sentence was not unwarranted).    A defendant is

only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a

particular result."    <u>United States v. Carrasco-De-Jesus</u>, 589 F.3d 22, 29 (1st Cir. 2009).

Moreover, in <u>United States v. Joseph</u>, 399 F. App'x 599 (D.C. Cir. 2010), the D.C.

Circuit determined that where the district court at sentencing conducted an appropriate

comparison of the sentences of <u>co-conspirators</u> in a single case, that comparison satisfied §

3553(a)(6).    <u>See</u> <u>also</u>, <u>Gall</u>, 552 U.S. at 54-55 (acknowledging as an acceptable practice the

comparison of sentences of co-defendants within the same conspiracy) ("[I]t seems that the judge

gave specific attention to the issue of disparity when he inquired about the sentences already

imposed by a different judge on two of Gall's co-defendants."); <u>United States v. Fernandez</u>, 443

F.3d 19, 31 n. 9 (2d Cir. 2006) ("The plain language of § 3553(a)(6) seems not to prohibit judges

from considering disparities between co-defendants").    In turn, the prevailing practice in the

D.C. Circuit has been to compare co-defendants within the same case for unwarranted sentencing

disparities rather than attempting to make comparisons to defendants in unrelated cases either

within the District or outside the District.    <u>See</u>, <u>e.g.</u>, <u>Mejia</u>, 597 F.3d at 1344; <u>United States v.</u>

<u>Colwell</u>, 304 F. App'x 885, 885-86 (D.C. Cir. 2008) (upholding sentence against § 3553(a)(6)

challenge on the basis of co-conspirators' criminal history category and number of fraudulent transactions in which co-conspirators participated, how much co-conspirators contributed to conspiracy's success, and crime to which each co-conspirator pled guilty); United States v. Bras, 483 F.3d 103, 114 (D.C. Cir. 2007) (finding no unwarranted sentencing disparity because defendant and co-conspirators "did not hold comparable positions, either in the conspiracy or in their workplaces" and co-conspirators "provided substantial assistance in the investigation of the scheme, while [the defendant] did not").

The statutory sentencing factors call upon the Court to avoid unwarranted sentencing disparities among defendants with similar records that have been found guilty of similar conduct. In the instant case, the Defendant is not similarly situated to the majority of other co-defendants, many of whom cooperated fully with the Government thereby earning reductions in their sentences for their substantial assistance, a similarity that the Defendant does not share. Furthermore, the evidence demonstrates that the Defendant was the leader of the DTO and is therefore in a position where his conduct is not similar to the conduct of his subordinate co-conspirators.   Under the unique circumstances of this case, the Government views co-defendant William Eliu Martinez as the only co-defendant similarly situated in this case.   Co-defendant Martinez received a sentence of 348 months from this Court on January 18, 2006.   Thus, an advisory guideline sentence is appropriate and reasonable in this case to avoid unwarranted sentencing disparities.

**E.** **Any Mitigating Factors Identified in the PSR Do Not Warrant a Departure or Variance from the Applicable Guidelines Range**

The Government anticipates that the Defendant will request the Court depart or vary from the applicable guidelines range based on several factors listed in the PSR.   For example, the

PSR indicates that the Defendant suffered from numerous medical ailments ranging from a heart attack in 2006 (prior to his detention in this case), to a hernia, gout, sinusitis, elevated cholesterol and other ailments.   See PSR ¶¶ 52-54.   While the Government is sympathetic to the Defendant's medical situation, these conditions are not so serious as to warrant a departure or variance from the applicable guidelines range.   Indeed, these conditions are routinely and successfully treated by BOP in the past and there's no reason to believe BOP will be unable to successfully treat upon the Defendant's designation.   Further, the Defendant bears the burden of proving by a preponderance of the evidence that he is eligible for a downward departure. United States v. Goodwin, 317 F.3d 293, 297 (D.C. Cir. 2003) citing United States v. Sachdev, 279 F.3d 25, 28 (1st Cir. 2002).

Moreover, the PSR indicates that the Defendant has been receiving more than acceptable medical care while in custody.   Indeed, the Defendant has been prescribed numerous medications that he appears to be responding well too.   Additionally, the Defendant has declined numerous medical screenings and procedures that have been offered to him while in custody. See PSR ¶¶ 53, 54.   Further, this Circuit has recently upheld advisory guideline sentences finding the sentences not to be substantively unreasonable in light of a defendant's health problems.   See United States v. Carl, 461 F. App'x 1, 2 (D.C. Cir. 2012) (citing Rita v. United States, 51 U.S. 338, 358, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)).   In Carl, the court concluded that other factors counterbalanced defendant's declining health, in particular, the defendant's conduct and seriousness of the offense.   Here, the seriousness of the Defendant's involvement in running a decades-long drug trafficking conspiracy involving tonnage quantities of cocaine being illegally imported into the United States clearly

34

counterbalances any mitigation from the Defendant's medical ailments.   Thus, the Defendant's medical condition should not serve as a basis for the Court to grant a variance or departure from the advisory guidelines range.

Additionally, the Government anticipates that the Defendant will ask the Court to impose a sentence below the applicable Guidelines Range due to the Defendant's age.   The Sentencing Guidelines addresses a departure based on age and states that "characteristics may warrant a sentence outside the applicable guideline range if the characteristic, individually or in combination with other such characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." U.S.S.G. § 5H1.1.   The facts and circumstances in this case do not warrant such a departure.   Here, the Defendant's age is not to such an usual degree as to necessitate a departure.   Rather, the serious nature of the offense, the Defendant's dominant role as the patriarch of this DTO, the use of public corruption, all militate towards a guidelines sentence of 324 to 405, and not towards a departure due to the Defendant's age.

Further, the Introductory Comments immediately preceding U.S.S.G. § 5H1.1 note the relevance of certain specific offense characteristics at sentencing, such as age.   It specifically notes that the purpose in examining these offense characteristics is "to provide sentencing courts with a framework for addressing specific offender characteristics in a reasonably consistent manner.   Using such a framework in a uniform manner will help 'secure nationwide consistency,' see Gall v. United States, 552 U.S. 38, 49 (2007), 'avoid unwarranted sentencing disparities,' see 28 U.S.C. § 991(b)(1)(B), 18 U.S.C. § 3553(a)(6), 'provide certainty and fairness,' see 28 U.S.C. § 991(b)(1)(B), and 'promote respect for the law,' see 18 U.S.C. §

3553(a)(2)(A)." See U.S.S.G. Chapter Five, Introductory Comments.

This Circuit also previously upheld a guideline 324 month sentence for a defendant convicted of conspiracy to distribute cocaine, crack cocaine and heroin, despite the fact that the defendant was "quite along in age" and his declining health.   See United States v. Law, 528 F.3d 888, 902 (D.C. Cir. 2008).   Here, should the Court depart downward based on the Defendant's age, it would create unwarranted sentencing disparities with other co-defendants.   It would also, in essence, reward the Defendant for successfully trafficking tons of cocaine through Guatemala for decades without getting arrested and extradited to the United States until he was over 80 years old.[6]

In sum, while the Defendant may argue that there are some mitigating circumstances that warrant a downward departure, these circumstances do not outweigh the overwhelming aggravating factors in this case as discussed above.   The Defendant's role in this long standing, large scale, international drug trafficking conspiracy necessitate a guidelines sentence of 324 to 405 months.   Thus, such a sentencing departure is not appropriate in this case and should not be granted.

IV.   **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to a term of imprisonment within the applicable Sentencings Guideline range of 324 to 405 months, as calculated by the PSR, which is reasonable, appropriate and matches the severity of the crimes committed by the Defendant in this case.   The Government submits that a sentence including a 304 to 425 months term of imprisonment is sufficient, but not greater than

---

[6] It is also of note that the Defendant fought extradition for approximately three years, which further contributed to his advanced age at the time of sentencing in this case.

necessary, to punish the Defendant for his crime, promote respect for the law, deter the

Defendant and others from committing similar serious crimes in the future, and protect the

public.

<div style="margin-left:40%">

Respectfully submitted,

ARTHUR WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:   /s/ Michael N. Lang
      Michael N. Lang
      Amanda N. Liskamm
      Adrian Rosales
      Trial Attorneys
      Narcotic and Dangerous Drug Section
      Criminal Division
      United States Department of Justice
      145 N Street, NE
      Washington, DC 20530
      (202) 616-0381
      Michael.Lang@usdoj.gov

</div>

Date: February 17, 2015

## **CERTIFICATE OF SERVICE**

I hereby certify that on this day of February 17, 2015, I served the Defendant a copy of this filing via his defense counsel of record, Angel Eduardo Balarezo and Joaquin Perez, via ECF.

*/s/ Michael N. Lang*
Michael N. Lang
Amanda N. Liskamm
Adrian Rosales
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE
Washington, DC 20530
(202) 616-0381
Michael.Lang@usdoj.gov