UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 03-CR-331 (CKK) |
| | ) | |
| v. | ) | |
| WALDEMAR LORENZANA-LIMA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

### I.    INTRODUCTION

The United States of America respectfully submits this Memorandum in Aid of Sentencing, in accordance with 18 U.S.C. § 3553(a).   As set forth below, a sentence within the Guidelines range of 324 to 405 months imprisonment is sufficient, but not greater than necessary, to comply with the purposes of 18 U.S.C. § 3553(a); and is in accord with the terms set forth in the plea agreement under Federal Rule of Criminal Procedure 11(c)(1)(B).   The sentencing hearing is scheduled for September 19, 2019 at 10:00 a.m.

### II.    BACKGROUND

#### A.  Procedural History

On March 10, 2009, a federal grand jury sitting in this district returned an Indictment against the Defendant Waldemar LORENZANA-LIMA, also known as "Valdemar Lorenzana-Lima" or "Don Valde," ("Defendant") charging that, from in or around 1996 and continuing thereafter up to and including 2009, from the countries of Colombia, El Salvador, Guatemala, and Mexico, and elsewhere, the Defendant conspired with others to commit the following offenses against the United States: (1) to unlawfully, knowingly and intentionally import five kilograms or more of a mixture and substance containing a detectable amount of cocaine into the United States;

and (2) to knowingly and intentionally manufacture and distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, intending and knowing that such substance would be unlawfully imported into the United States, all in violation of 21 U.S.C. §§ 952, 959, 960, 963, and 960(b)(1)(B)(ii) and 18 U.S.C. § 2.

The Defendant was arrested in Guatemala on April 26, 2011. The Defendant fought extradition until his eventual extradition to the United States on March 18, 2014.   The Defendant made his initial appearance on March 20, 2014 where he was detained pending trial.   The Court set a trial date for January 5, 2015.

On August 18, 2014, the Defendant pleaded guilty to conspiracy to import five hundred (500) grams or more of cocaine into the United States, and to manufacture and distribute five hundred (500) grams or more of cocaine, intending and knowing that the cocaine will be unlawfully imported into the United States, all in violation 21 U.S.C. §§ 952, 959, 960 and 963, the lesser included offense and penalty provision of 21 U.S.C. § 960(b)(2) in Count One of the Third Superseding Indictment.   The Court found a sufficient basis to accept the Defendant's plea, even though the Defendant, during the plea colloquy itself, contested some of the facts previously agreed to in the signed Statement of Facts.   Specifically, the defendant minimized his own role in the drug trafficking conspiracy as compared to the Statement of Facts, and laid a majority of the responsibility on his sons.

On January 22, 2015, the Court ordered that the Defendant be examined by a member of the psychiatric staff of the Forensic Legal Services Division, and after such examination, provide a written report.   On February 26, 2015, the Court ordered the Defendant's transfer to the Federal Correctional Medical Facility in Butner, North Carolina ("Butner FMC") for a mental

competency evaluation for sentencing pursuant to 18 U.S.C. §§ 4241, 4274.   On November 13, 2015, the Court received the psychiatric evaluation of the Defendant conducted by clinicians at FMC Butner, wherein the Defendant was found competent.   On July 26, 2017, the Court ordered FMC Butner mental health professional to re-examine the Defendant, in light of the Defendant's expert report and the amount of time that has elapsed since the Defendant was previously evaluated for his competency.   On September 18, 2018, the Court held a Competency/Evidentiary Hearing, which was adjourned.   On October 3, 2018, the Court ordered that the Defendant be committed to the custody of Butner FMC to undergo a limited period of treatment to restore competency prior to the continuation of the competency hearing. On March 29, 2019, the Court received the Report from FMC Butner, wherein the Defendant was found competent.   On June 21, 2019, the Defendant filed a notice that he would not contest the findings of competency.   On July 8, 2019, in light of the findings of competency by Butner FMC and the Defendant's voluntary concession thereto, the Court scheduled sentencing for September 19, 2019.

**B. Defendant's Conduct**

As a basis for requesting a Guidelines Sentence, the Government relies on the following information:

### 1.    Relevant Conduct in the Presentence Report[1]

During the course and in furtherance of the charged conspiracy, the Defendant was a leader of a drug trafficking organization ("DTO") which, from in or about March 1996 and continuing until at least November 2007, received, inventoried and stored large quantities of

---

[1] On September 19, 2014, the United States Probation Office ("USPO") filed its Presentence Report ("PSR").   On August 29, 2019, the USPO filed a revised PSR.

cocaine from Colombia that would later be imported into Mexico, and ultimately, into the United States for further distribution.   PSR ¶ 6.   Some of this cocaine would arrive in El Salvador via "go-fast" boats from Colombia and was then smuggled into Guatemala by land.   *Id.*   The DTO also used cocaine-laden aircraft that would land on clandestine airstrips located on or near properties owned and utilized by the DTO, including the Defendant.   *Id.*   The DTO, including the Defendant, received, inventoried, stored, and further distributed the cocaine for importation into the United States.   PSR ¶ 7.   The Defendant was paid a fee for each shipment of cocaine that members of the conspiracy received, stored, transported and sold on the Defendant's properties or those of his DTO co-conspirators during the conspiracy.   *Id.*   Members of the DTO would then illegally sell the cocaine to Mexican drug traffickers in Guatemala knowing or intending that it would be further distributed to the United States.   *Id.*

During the course of his involvement in the conspiracy, several shipments of cocaine being distributed by the Defendant's DTO, or intended for the Defendant's DTO, were seized by law enforcement authorities of several different countries.   *Id.*   The Defendant was aware that the cocaine was going to be illegally imported into the United States for further distribution and he agreed that venue and jurisdiction lie with the United States.   *Id.*

The Defendant was a leader of the DTO, which involved five or more participants.   *Id.*   Specifically, the Defendant directed where shipments of cocaine would be stored in Guatemala for further distribution and directed the actions of co-conspirators, including his sons.   *Id.*   At other times during the time period of the charged conspiracy, the Defendant allowed his sons to take the lead in planning and organizing the drug shipments; however, the Defendant continued to receive a portion of payments his sons and co-conspirators received during the course of the conspiracy.   *Id.*

In order to protect their multi-hundred kilogram shipments of cocaine from being seized by law enforcement or stolen by other DTOs, the Defendant and co-conspirators paid foreign government officials to provide information to the DTO, to avoid detection or interference with the movement of the cocaine, and also to release co-conspirators from imprisonment. *Id.* Indeed, one of the Government's cooperating witnesses provided the Defendant with money for bribes of public officials when the Defendant's son, Eliu, was detained in 1999, after he was found in possession of multiple firearms. *Id.* The Defendant's son was later released from custody. *Id.* Further, the Defendant employed an Army captain to "show that there was a level of security," and as a connection to safeguard shipments of cocaine. *Id.* The Defendant routinely encouraged members of the DTO to pay authorities in the area to protect the loads of cocaine, and corrupt law enforcement officers were employed to escort the shipments. *Id.*

During the course of the conspiracy, the Defendant and his co-conspirators were involved in laundering millions of dollars that constituted proceeds from cocaine trafficking. *Id.* In April 2003, Guatemalan officials executed search warrants at two residences in Guatemala City and seized approximately $14 million dollars, weapons, and drug ledgers. *Id.* The ledgers included references to several members of the Defendant's DTO. *Id.* The payments reflected in the ledgers show that the various members of the DTO, including the Defendant's family members, made payments to or were paid for cocaine trafficking activities in United States currency. *Id.* Many of the payments were made in 2001. *Id.* Additionally, the Defendant was investing money into legitimate business including a fruit plantation, an import export business, and cattle farming; however, the money for these legitimate businesses was coming from his sons and their illicit drug trafficking activities and proceeds. *Id.*

The total amount of cocaine involved in this drug trafficking activity well exceeded 450

kilograms of cocaine.   PSR ¶ 8.

## 2.      Proffered Relevant Conduct

In addition to the information contained in the PSR as described above, the Government

proffers the testimony of the following two witnesses, which supports the Government's

contention that a Guidelines sentence is appropriate.[2]   The Government also includes citations

from the trial transcripts of *United States v. Eliu Lorenzana-Cordon and Waldemar Lorenzana-*

*Cordon.*

### a.      Otto Herrera-Garcia ("Herrera-Garcia")

Herrera-Garcia has pleaded guilty to federal drug trafficking offenses in the United

States.   Herrera-Garcia grew up with the Lorenzana family in Guatemala.   Herrera-Garcia

worked for the Defendant and his DTO from approximately 1995 to approximately 2003.

Herrera-Garcia's role was to coordinate loads of cocaine being transported from Colombian

DTOs through Guatemala to Mexico.   These loads of cocaine were eventually illegally brought

into the United States for further distribution.   While coordinating these loads of cocaine,

Herrera-Garcia worked with the Defendant and his sons and co-defendants, Haroldo, Eliu and

Waldemar Jr., to transport and store the cocaine in Guatemala.   From approximately 1995 to

1999, Herrera-Garcia coordinated cocaine shipments for the Lorenzana DTO containing

approximately 500 to 2,000 kilograms of cocaine every two months on planes from Colombia to

---

[2]  The Government relies on the September 5, 2019 Order that states that in lieu of live witnesses,
the Government may rely upon trial testimony from the Defendant's co-defendants in support of
its recommended sentencing enhancements for leadership and aircraft.   *See* Dkt. No. 1094 at 2.
This Memorandum also contains some factual information about the Defendant's activity that the
Government did not elicit during the trial but are based on proffer sessions with the witnesses
attended by law enforcement agents who would be able to testify as to what the witnesses
informed the Government in those debriefings.

Guatemala.   The planes delivered the cocaine to various airstrips on properties controlled by the Lorenzana DTO.   The DTO continued to receive aerial shipments until approximately 2002 to 2003.   However, during this period, the operations between Herrera-Garcia and the Lorenzanas largely shifted to maritime ventures.

This partnership began in approximately 1995, when Herrera-Garcia met with Haroldo Lorenzana and told him about a proposition involving Mexican traffickers that requested a "person that could provide an airfield property where we could store and safeguard cocaine shipments and be able to secure them until the Mexican drug traffickers could come pick them up."[3]   Trial Tr. Mar. 1, 2016 a.m. at 26–31 ("Tr. 3/1/16 a.m. at 26–27").[4]   Haroldo responded that he was very interested but that had to ask his father, the Defendant, before agreeing to the business proposition.   *See Id.* at 27.   Haroldo invited Herrera-Garcia to Easter dinner at the Defendant's property, and Herrera-Garcia relayed the same proposal to the Defendant.   *See Id.* at 29-30.   Specifically:

> an airplane leaves Colombia illegally with a load of cocaine.   We provide a landing field in Guatemala where the airfield [sic] lands, and then off-load the shipment of cocaine, refuel the airplane, send the airplane back to Colombia, and we then proceed to store and safeguard the shipment for whatever time it takes for the drug - - Mexican drug traffickers to stop by and pick it up.

*Id.*   Herrera-Garcia explained that according to the proposal, the Lorenzanas would provide "the

---

[3] Herrera-Garcia approached the Lorenzanas because he knew that there were several acres of property comprised of agricultural fields and warehouses that were controlled by the Lorenzana family in La Reforma, Guatemala.   Herrera-Garcia knew that many of the properties were once owned by the Defendant and then transferred to his sons.   For example, the family owned or had control over *Los Conejos, Las Canas,* and *La Melonera*, which had airfields, and *La Calera*, *El Llano* and *La Finquita* which had warehouses to store the cocaine.

[4] All citations to the trial transcripts in *United States v. Eliu Lorenzana-Cordon and Waldemar Lorenzana-Cordon* are abbreviated herein using the same format.

airfield . . . the property to safeguard the cocaine . . . [and] make sure it [the cocaine] was secure." *Id.* at 30.   The Defendant told Herrera-Garcia he needed to think about it and ultimately consented to the proposal a few weeks later.   *Id.* at 31.

While Herrera-Garcia and Haroldo were directly involved in the planning and logistics of the proposed drug trafficking operation, the Defendant authorized the work, and designated what property would receive the plane and store the cocaine.   With the Defendant's express authorization, Herrera-Garcia worked with Defendant's sons Haroldo, Waldemar Jr. and Eliu, to traffic cocaine through the Lorenzana properties in Guatemala.   When cocaine-laden aircraft were scheduled to arrive in Guatemala, Herrera-Garcia would alert the Defendant of the need to use one of the properties to receive a pending shipment.   The Defendant would speak with his sons and then give Herrera-Garcia a time-frame that the property would be available.   Further, the Defendant directed Herrera-Garcia as to which airstrip and when Herrera-Garcia should direct an aircraft to land.   As Herrera-Garcia testified "the only requirements from him [the Defendant] was that he would - - he would call the day.   He would call the day and he would let us know when it could be done." *Id.* at 31.

Herrera-Garcia acknowledged that while the Defendant was not intimately involved in the nuances of the day to day operations, the Defendant made all executive decisions regarding the DTO.   Herrera-Garcia knew that he needed the Defendant's express consent prior to conducting business with the Lorenzana's sons at the various Lorenzana properties.   Further, Herrera-Garcia believed that the Defendant attempted to conceal his role in these drug trafficking activities by avoiding being present at the properties when the cocaine shipments were being delivered, always making sure to be at another location.   Herrera-Garcia testified that despite the Defendant's absences on site, the Defendant exercised extensive managerial oversite of the DTO

as:

> the pitch came through their father . . . it's like he [the Defendant] knew there was enough work that could be spread in between all of them, and that's how we - - in between him and me, Waldemar Lorenzana Senior and myself agreed to start moving the jobs in between them [Eliu, Haroldo, and Waldemar Jr.].

Tr. 3/3/16 a.m. at 64–65.

For example, in approximately 1998, during the aerial operations, the Mexicans wanted to increase the frequency and amounts of cocaine shipments moving through the Lorenzana properties, and Herrera-Garcia informed Haroldo of this request.   Tr. 3/1/16 a.m. at 36–42. Haroldo indicated that "he [Haroldo], once again, told me that we needed to talk to his father." *Id.* at 37.   Herrera-Garcia approached the Defendant and he expressed concerns about the increased traffic at the Lorenzana property, *Los Canas*, and suggested they slow down and find a better place to restart the operations.   *See id.* at 37–41.   Herrera-Garcia agreed to the Defendant's terms and he, the Defendant, and Haroldo began searching and visiting other suitable Lorenzana properties.   *See id.*

The Defendant knew that Herrera-Garcia was using their properties for airplane shipments as he was present when they inspected a variety of Lorenzana properties and ultimately decided the most suitable property.   *See id.*   Herrera-Garcia testified "we inspected the first area in the Lorenzanas properties that they call *El Llano*, and it was too small.   It didn't meet the requirement for the airfield."   *Id.* at 39.   The Defendant, Herrera-Garcia, and Haroldo decided to use another Lorenzana property, *La Melonera* as "we were going to use one of the roads, one of the dirt roads, accommodated, you know, for an air strip and use it for landing an

aircraft."[5]   *Id.* at 40–41.

However, the aerial operations at *La Melonera* stopped when an airplane loaded with cocaine crashed at the property and the Defendant ordered operations to cease until they could find a new property.   *See* Tr. 3/1/16 a.m. at 48–52.   The Defendant expressed his concern that the area was becoming too congested and indicated that he "was not very happy" and "didn't like the way things were handled."   *Id*. at 48–49.   Further, the Defendant "advised me [Otto-Herrera] and Haroldo that we could not do anything else in the area" and "we did follow his— you know, his advice.   We slowed down and once again started looking for more options to see if we could find a different airfield.   *Id.* at 49.   Herrera-Garcia, the Defendant, and Haroldo decided to use another property, *Los Conejos*, after Herrera-Garcia "did an inspection, make sure that the airfield was - - you know, was appropriate for the job."   *Id.* at 50.

Herrera-Garcia originally planned to work the shipments with Haroldo, however, was instructed by the Defendant "that if things were going to be done around the area, he wanted him [Eliu] more involved so that he could make sure that things were going to be done correctly" and so "things would work a little better."   *Id.* at 50–51.   Herrera-Garcia consented and had a meeting with Haroldo and Eliu and explained "that the airplane, of course, was going to come. We were to off-load the airplane, refuel, put the cocaine on a truck so it could be moved back to La Reforma."   *Id.* at 51.   While the Defendant was not present at these operational meetings, Herrera-Garcia indicated that "it was discussed with him [the Defendant] that we were going to work there [*Los Conejos*]."[6]   *Id.* at 51.

---

[5]  For *La Melonera*, the DTO unloaded a Piper Navajo airplane that carried approximately 600 kilograms.   *Id.* at 42.

[6]  For *Los Conejos*, the DTO unloaded a Cessna 206 airplane that carried approximately 450 kilograms.   *Id.* at 52.

From approximately 1999 to 2002, the DTO also received shipments of cocaine in El Salvador via go-fast boats that left from Colombia and arrived off of the Pacific Coast of El Salvador.   These boats were met on the waters of the Pacific Ocean by another set of go-fast boats that launched from El Salvador.   The cocaine was then transferred to the Salvadoran go-fast boats, which then brought the cocaine to land in El Salvador.   There were approximately seven to eight loads of cocaine delivered utilizing the go-fast boat method, ranging in average size from 1,500 to 2,500 kilograms of cocaine.   According to Herrera-Garcia, once the cocaine was received in El Salvador, it was inventoried and then transported to Guatemala on banana trucks.   Herrera-Garcia coordinated the arrival of the loads at the Lorenzana warehouses.   Once the loads of cocaine arrived at the warehouses, they were inventoried by Herrera-Garcia, along with Byron Linares-Cordon, Haroldo, Eliu and Waldemar Jr.   The cocaine was eventually sold to Mexican traffickers for importation into the United States.

Prior to starting the aforementioned El Salvador maritime operation, Herrera-Garcia once again discussed this new route with the Defendant and sought his express permission.   *See* Tr. 3/2/16 a.m. at 15. Herrera-Garcia testified that he:

> again went to speak to Haroldo and his father.   And kind of run it through them, you know, the option that we were having, and that there was going to be a possibility of work coming from El Salvador, and that their locations were very important for this operation to take place.

*Id.* at 15.   The Defendant also decided which son was to receive the load of cocaine and to which property Herrera-Garcia was to coordinate delivery of the cocaine.   *See* Tr. 3/2/16 a.m. at 24–27.   For example, the Defendant decided against using Haroldo's property *La Calera* and "the [Defendant's] suggestion was for me to inspect an old warehouse that they had in a location that they called *El Llano*."   *Id.* at 24–25.   The Defendant and Herrera-Garcia went to *El Llano*

to inspect the property and determine its suitability for receiving and storing loads of cocaine. *See id.* at 24–26. The Defendant showed Herrera-Garcia structures as possible locations to receive and store the cocaine, and "it was instructed by Waldemar, Sr., that the warehouse was being remodeled to the size that I [Herrera-Garcia] needed it." *Id.* at 25.

While working with the Lorenzana DTO, Herrera-Garcia never paid the Defendant directly. Rather, Herrera-Garcia paid Haroldo, Eliu, or Waldemar, Jr., depending on which son was receiving and storing that load of cocaine. However, Herrera-Garcia knew that the Defendant received payments for the shipments that Herrera-Garcia coordinated with Haroldo, Eliu and Waldemar, Jr. When negotiating prices for using the Lorenzana airstrips, and the Lorenzana transportation and storage services with Herrera-Garcia, Haroldo, Eliu and Waldemar, Jr. often stated that a big portion was going to the Defendant. For example, in 1995 or 1996, if Herrera-Garcia and the Lorenzanas were receiving an aircraft that transported cocaine, the Lorenzanas would get 25 kilograms of cocaine for receiving the aircraft on one of their properties. At $6,000 per kilogram, the 25 kilograms of cocaine amounted to a payment of $150,000, in United States currency. Haroldo and Eliu told Herrera-Garcia that they were only keeping $15,000 to $20,000 and that the Defendant took the rest. They would even frequently ask that Herrera-Garcia defer payment, saying to Herrera-Garcia, "don't pay us now because the Old Man will take some." Furthermore, Herrera-Garcia knew that the Defendant's sons had to pay a large portion of their fees to the Defendant because they would, at times, try to receive cocaine shipments from Herrera-Garcia without the Defendant's knowledge to avoid having to pay the Defendant. Haroldo would also ask Herrera-Garcia not to tell the Defendant about bigger planes that were coming through with cocaine when the Defendant was not present in order to hide some of the commission from the Defendant.

Not only did the Lorenzanas charge a percentage of the cocaine loads for use of their airstrips, as well as their role in transporting, storing, and ensuring the security of the cocaine, they also received a portion of the loads to sell to Guatemalan and Mexican traffickers.   Herrera-Garcia is also aware that the Lorenzanas had local customers and sold locally from 1999–2003 at a much higher rate than they paid for the cocaine.   Specifically, the Lorenzanas kept 40% of the cocaine they received from the Colombian suppliers for themselves to sell to their Mexican customers (who, in turn, largely transported the cocaine for ultimate distribution and sale into the United States).   Herrera-Garcia also knew that the Lorenzanas laundered their drug proceeds through facially "legitimate" business ventures in Guatemala.   Namely, the Defendant invested in limes, real estate and cattle with the proceeds from his drug trafficking.   Additionally, the Defendant contacted Herrera-Garcia in approximately 2002 to ask for Herrera-Garcia's advice as to how to invest his drug proceeds in legal ventures, as a way to conceal and launder drug proceeds.

The Defendant also paid bribes as part of his drug trafficking operation.   For example, Herrera-Garcia knows of an incident in which Eliu was arrested in 1999 in La Maquina, Guatemala with weapons while for waiting for a load of cocaine to be delivered.   Tr. 3/1/16 a.m. at 81–82.   The Defendant told Herrera-Garcia that "he [the Defendant] was already doing what he had to do.   He was already - - I think he was already on his way over to try to resolve the situation, and he told me not worry about it, that he would take care of it."   *Id.* at 82.   Herrera-Garcia ultimately gave the Defendant money for the payment to the police "to resolve the situation," meaning "to pay off the authorities, to get Eliu and the other guys out of jail."   *Id.*

Further, the Lorenzana DTO would use local law enforcement officials to help protect the drugs from being stolen or seized in Guatemala; and on occasion, the DTO used local law

enforcement for the actual transport of cocaine shipments.   Haroldo and Eliu would often brag to Herrera-Garcia that the police were on their side.   According to Herrera-Garcia, the Defendant was the one that established and maintained relations with Guatemalan law enforcement to further the organizations drug trafficking activities.

      b.   Byron Linares-Cordon ("Linares-Cordon")

Linares-Cordon pleaded guilty to federal drug trafficking offenses in the United States. Linares-Cordon grew up in Guatemala with the Defendant's sons, Haroldo, Eliu, and Waldemar Jr.   Starting in 1998, Linares-Cordon worked with Haroldo, serving as a lookout while Haroldo was receiving cocaine shipments at various locations in Guatemala.[7]   Tr. 2/23/16 a.m. at 100–102.   Linares-Cordon continued to work with the Lorenzana family and Herrera-Garcia until approximately 2003.

Linares-Cordon was an accountant for the DTO and, in that role, kept a series of ledgers. The ledgers noted the distributions and payments of cocaine arriving in Guatemala, a significant portion of which was stored on the Lorenzana properties.   Linares-Cordon was also responsible for arranging meetings with the Lorenzana sons to coordinate the delivery and storage of cocaine arriving in Zacapa, which was stored at the Lorenzanas' warehouses.   Linares-Cordon was also authorized by Herrera-Garcia to release cocaine for distribution upon receiving payment from Herrera-Garcia's customers.   Linares-Cordon was also responsible for transporting the drug proceeds from the rural areas of Guatemala to Guatemala City, Guatemala.

In the early 2000s, the Lorenzanas became involved in a maritime operation in El Salvador.   From El Salvador, the cocaine was loaded onto tractor trailers and transported across

---

[7]  These aerial loads consisted of approximately 400 to 500 kilograms of cocaine.   *Id.* at 102.

the border into Guatemala and delivered to the Lorenzana properties, where it was unloaded and stored in warehouses owned by the Lorenzanas.   Linares-Cordon knew that the Defendant was concerned about the increase in activity at the Lorenzana properties could attract law enforcement attention.   As such, Linares-Cordon witnessed the delivery of the cocaine shift primarily to *El Llano,* owned by Eliu, and saw improvements being made to *El Llano* such as the enlargement of the gate at the property front that would accommodate the tractor trailers' arrival, as well as the enlargement of Eliu's warehouse to allow the trailers to fully pull into the structure before unloading the cocaine.   According to Linares-Cordon, from early 2000 until approximately the end of 2002 to early 2003, the El Salvador operation delivered roughly 1,500 to 1,700 kilograms of cocaine approximately twice per month to Lorenzana properties.

Linares-Cordon knew that the Lorenzanas continued to receive aerial shipments from 2001 until 2003, even during the El Salvador operation and referenced entries in his narcotics ledger.   Tr. 2/23/16 p.m. at 19–20.   For example, Linares-Cordon indicated that the ledger note of "$3,788,090" in United States currency referred to profits from aerial shipments that law enforcement recovered from a car, some of which were attributable to the Lorenzana's DTO. *Id.* at 19.   Linares-Cordon indicated that while "very few of these flights had merchandize stored in the property of the Lorenzana-Cordons," each shipment still consisted of "between a thousand and a thousand five hundred kilos per flight."   *Id.* at 20.

While Linares-Cordon never saw the Defendant at any delivery location while the cocaine was actually arriving, Linares-Cordon would observe the Lorenzana sons, Herrera-Garcia, and other co-conspirators in charge of receiving the incoming shipments of cocaine, gather at one of the Defendant's sons' residences for a group meal following the cocaine's arrival and storage.   The Defendant would nearly always attend these gatherings, which

15

Linares-Cordon believed demonstrated that the Defendant was aware of the arrival of these cocaine shipments and maintained control of all of the family's drug trafficking activities. Linares-Cordon also believed that the Defendant's presence implied that the Defendant was to receive a portion of the profits gained through the DTO's efforts, as these dinner meetings served as a means for facilitating the distribution of the proceeds of the DTO's ventures.

During these meetings, the Defendant would always take Herrera-Garcia aside to discuss drug trafficking issues and direct Herrera-Garcia to proceed with caution in in future activities and shipments.   Herrera-Garcia told Linares-Cordon the substance of these conversations, including how the Defendant told Linares-Cordon that the family was making money, but that the Defendant was always cautious about drawing too much attention to their activities at the risk of attracting the scrutiny of law enforcement.   According to Linares-Cordon, the Defendant's own sons would often attempt to coordinate drug transactions behind the Defendant's back, which Linares-Cordon believed was to avoid paying the Defendant his percentage of the drug proceeds.

The Defendant was also responsible for bribing officials to facilitate the continued operation the DTO's trafficking activities.   Specifically, in 1999, the Defendant's sons, Eliu and Ovaldino were arrested for weapons possession when they were caught by local law enforcement with weapons in a truck that belonged to Herrera-Garcia while Eliu and Ovaldino were waiting to receive a maritime shipment of cocaine.   According to Linares-Cordon, the Defendant gave money as a bribe to law enforcement to secure their release.

## III.   A GUIDELINES SENTENCE IS REASONABLE

### A.   The PSR Guidelines Calculations

On September 19, 2019, the United States Probation Office filed its Presentence

Investigation Report ("PSR").   In the PSR, the Probation Office correctly calculated a base offense level of 38, finding the Defendant accountable for over 450 kilograms of cocaine pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1).   PSR ¶ 9.   The PSR applied two sentencing enhancements: the first, a two-level adjustment for use of an aircraft pursuant to U.S.S.G. § 2D1.1(b)(2)(A).   *Id*.   This enhancement was properly applied based on the use of aircraft to transport cocaine loads from Colombian to Guatemala by the Defendant's DTO.   PSR ¶ 6.   Further, these cocaine-laden aircraft subsequently landed on airstrips controlled by the Defendant and his DTO in Guatemala.   *Id*.

Second, the PSR applied a four-level adjustment for a managerial or supervisory role in the offense.   PSR ¶ 9.   The PSR accurately found that the Defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, therefore, four levels are added.   USSG §3B1.1(a).   *Id*.   The PSR correctly detailed how the Defendant was the leader of the DTO and provided direction and instruction to the other members of the conspiracy, including his sons.   PSR ¶ 7.   Further, the Defendant owned warehouses which he gifted to his sons and decided which son would receive specific shipments of cocaine.   *Id*.   Toward the end of the charged conspiracy, the Defendant allowed his sons to take on leadership roles; however, the Defendant continued to receive money from each load of cocaine received by the DTO.   *Id*.   Accordingly, the PSR determined that a four-level adjustment is warranted, pursuant to the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 3B1.1(a).

Finally, the PSR applied a three-level offense level reduction for acceptance of responsibility pursuant to U.S.S.G. §3E1.1(a) and (b).   PSR ¶¶ 9, 10.   The PSR pertaining to this Defendant estimates his Adjusted Offense Level under the U.S.S.G. to be 41, resulting in a

sentencing range of 324 to 405 months.   PSR ¶ 14.   As set forth below, the Government

concurs with the Probation Department and submits that a Guidelines sentence is reasonable and

appropriate in this case.

###### B.        The Manager/Supervisor Role Enhancement Is Warranted

Section 3B1.1 of the Sentencing Guidelines provides that the sentencing court should

increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader

of a criminal activity that involved five or more participants or was otherwise extensive."

U.S.S.G. § 3B1.1(a).   As described in the comments to the Guidelines, to qualify for an

adjustment under this section, "the defendant must have been the organizer, leader, manager, or

supervisor of one or more other participants."   *Id*. at Application Note 2.   The Guidelines

further elucidate criteria to determine a Defendants role:   "[f]actors the court should consider

include the exercise of decision making authority, the nature of participation in the commission

of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of

the crime, the degree of participation in planning or organizing the offense, the nature and scope

of the illegal activity, and the degree of control and authority exercised over others."   *Id*. at

Application Note 4.   Courts within this Circuit have often cited the factors identified in

Application Note 4, particularly emphasizing that "[t]he exercise of decision making authority,

recruitment, and a claimed right to a larger share of the proceeds are prominent among the

factors that the commentary to the Guidelines indicates should be considered."   *United States v.*

*Wilson*, 240 F.3d 39, 46-47 (D.C. Cir. 2001) (declining to engage in an "exegesis of the concept

of control" and instead emphasizing decision-making authority, recruitment and claim over

larger share of proceeds); *United States v. Brodie*, 524 F.3d 259, 270 (D.C. Cir. 2008).   For

instance, in *United States v. Brodie*, the District of Columbia Circuit placed particular emphasis

on the fact that the defendant "recruited individuals with specialized skills to facilitate his scheme, … coordinated the group's efforts and directed them in the performance of their respective tasks, … [and] paid the other participants flat fees for their services … [while keeping] the 'fruits of the crime' for himself," when upholding the District Court's determination on the issue of leadership.   *Brodie*, 524 F.3d at 270.

There is sufficient evidence to support the PSR's factual findings for a four-level role adjustment in this case.   As described in the PSR and in the proffered testimony of the witnesses described above, the Defendant was the organizer and leader of the Lorenzana DTO, a sophisticated and extensive international drug trafficking organization comprised of more than five individuals, including Herrera-Garcia, Linares-Cordon, and the Defendant's three sons, among others.   The Defendant engaged in high-level negotiations and decision-making about the direction and investments of the conspiracy.   The evidence shows that the Defendant exercised substantial decision making authority and gave orders and instructions to his sons and others as to where and when loads of cocaine should be received, inventoried and stored so as to avoid law enforcement detection.   Both Herrera-Garcia and Linares-Cordon acknowledged the Defendant as the leader of the DTO and largely deferred to him.   Specifically, Herrera-Garcia would not engage in any new trafficking endeavor, such as the El Salvador maritime operation, without express permission from the Defendant.   Even when Herrera-Garcia had meetings without the Defendant, the sons would wait to make decisions until they discussed the venture with their father and ultimately received his permission.

Further, even when the Defendant took a less forward role in the conspiracy, he continued exercise control over the DTO by taking a large percentage of the profits either in the form of United States currency or percentages of the bulk cocaine shipments.   Specifically,

Herrera-Garcia recalled the sons hiding shipments from the Defendant so they could keep the larger profit for themselves. Linares-Cordon also remembered Lorenzana family dinners after receipt of larger shipments where the Defendant collected his share from the sons. Both witnesses recognized the Defendant as the patriarch and leader of the DTO that introduced his sons into the family business.[8]

Further, this was a sophisticated operation. The Defendant's DTO was trafficking massive quantities of cocaine from Colombia to Guatemala through various locations. Additionally, the Defendant's DTO utilized planes, maritime assets, trucks, landing strips, and warehouse storage facilities. The large quantities of cocaine that the Defendant and his DTO successfully trafficked from Colombia to Guatemala were then transported into Mexico and then into the United States for further distribution. This went on in tonnage quantities for decades.

The DTO was also extensive in that it was necessary to have an accountant maintain all of their drug and financial transactions. The DTO also involved corrupt law enforcement to help protect their activities and people from seizure and arrest. Moreover, the narcotic profits were so great that the Defendant and other senior DTO members had to devise creative and sophisticated ways to conceal and launder their drug proceeds into legitimate businesses.

Therefore, the four-level role adjustment is clearly warranted and should be applied in this case.

C.     **The Aircraft Enhancement is Applicable**

Section 2D1.1(b)(2)(A) of the Sentencing Guidelines provides that the sentencing court

---

[8] Section 3B1.1 of the Sentencing Guidelines provides that there can be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. *See* U.S.S.G. § 3B1.1, n.4.

should increase a defendant's offense level by two levels "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance . . ." The evidence clearly supports the application of the enhancement for use of an aircraft pursuant to U.S.S.G. §2D1.1(b)(2)(A). First, the Defendant admitted that his drug trafficking organization utilized airplanes throughout the course of their trafficking loads of cocaine from Colombia Guatemala. *See* Statement of Facts signed by the Defendant and filed on August 18, 2014.

Additionally, Herrera-Garcia and Linares-Cordon were aware that aircraft were used as part of the drug trafficking scheme that the Defendant participated in and orchestrated. *See United States v. Bethancourt*, 65 F.3d 1074, 1080-1081 (3rd Cir. 1995) (affirming the application of the aircraft enhancement despite the defendant's argument that it was not foreseeable or in furtherance of the conspiracy). Both witnesses testified extensively about the cocaine-laden aircrafts landing at airstrips owned or controlled by the Defendant and his DTO. Herrera-Garcia even detailed numerous conversations with the Defendant about the airstrip requirements and the need for additional properties that could handle the increased traffic. In response, the Defendant cautioned Herrera-Garcia about the dangers of drawing attention from law enforcement and directed him towards other Lorenzana properties to receive the cocaine laden aircrafts. Therefore, the application of this enhancement is clearly supported by both the witness testimony as well as the Defendant's own signed Statement of Facts.

**D.      A Guidelines Sentence is Reasonable and Appropriate**

The Sentencing Guidelines still provide strong guidance to the Court in light of *United States v. Booker*, 543 U.S. 220 (2005). Although *Booker* held that the Guidelines are no longer

mandatory, it also held that the Guidelines remain in place and that district courts must "consult"

the Guidelines and "take them into account" when sentencing.   *Booker*, 543 U.S. at 264.   As the

Supreme Court stated, "a district court should begin all sentencing proceedings by correctly

calculating the applicable Guidelines range" - that "should be the starting point and the initial

benchmark."   *Gall v. United States*, 552 U.S. 38, 39, (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined

in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and

characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes of sentencing (§

3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines range itself (§

3553(a)(4)); any relevant policy statement by the Sentencing Commission (§ 3553(a)(5)); "the

need to avoid unwarranted sentence disparities among defendants" (§ 3553(a)(6)); and "the need

to provide restitution to any victims" (§ 3553(a)(7)).   *Gall v. United States*, 552 U.S. at 50.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)      to afford adequate deterrence to criminal conduct;
>
> (C)      to protect the public from further crimes of the defendant; and
>
> (D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines

range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines

supports the premise that district courts must begin their analysis with the Guidelines and remain

cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. at 50, n.6.   Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "[t]he sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives." *Rita v. United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 552 U.S. at 38, 46.   To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 51.

A court should use the version of the Guidelines Manual in effect at the time of sentencing unless retroactive application of that version would result in a more severe penalty than would result from applying the version in effect at the time of the offense.   *Peugh v. United States*, 133 S. Ct. 2072, 2078, 2082-83 (2013) (recognizing an *ex post facto* violation when a defendant is sentenced under Guidelines providing a higher range than the Guidelines in effect at the time of the offense).[9]

For the reasons stated below, the sentencing factors found in the PSR should be applied in this case.   Namely, the enhancement for leader/supervisor and the use of an aircraft should be applied based on the evidence presented through the PSR, the statement of facts, and the

---

[9] The Government believes that the 2009 U.S.S.G. are applicable in this case and accordingly has not applied specific offense characteristics such as bribing a public official (U.S.S.G. § 2D1.1(b)(1)) or maintaining a premises for the purpose of distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)).   However, the Government believes that defendant's conduct related to these specific offense characteristics qualifies as relevant conduct and plans to introduce evidence of such at sentencing.   Further, this conduct is relevant for the purposes of the Court evaluating 3553(a) factors.

proffered testimony of Herrera-Garcia and Linares-Cordon.   Furthermore, the statutory factors

under 18 U.S.C. § 3553(a) warrant a guideline sentence of 324 to 405 months in this case.

Lastly, any mitigating factors found in the PSR do not warrant a variance or departure from the

applicable guideline range.   Therefore, a sentence between 324 to 405 months is appropriate in

this case.

### 1. Nature and Circumstances of the Offense, and Need for the Sentence to Reflect the Severity of the Offense

The Defendant committed serious crimes, over an extended period of time, against the

United States by controlling an extensive international DTO based in Guatemala that was

responsible for transporting multi-ton quantities of cocaine from Colombia to Central American

countries and Mexico for ultimate importation into the United States.   The Defendant's DTO

was expansive utilizing aircraft, maritime vessels, and various forms of ground transportation

methods to traffic multi-ton quantities of cocaine in multiple countries.   The Defendant's

trafficking of cocaine spanned several decades and involved mass quantities of cocaine.   Indeed,

the amount of cocaine that the Defendant is responsible for conspiring to import into the United

States, well exceeds the highest offense level under the Sentencing Guidelines.   This is a

testament to the extremely serious nature of the Defendant's criminal conduct.

Additionally, the proffered testimony of the Government's witnesses establishes that as

the patriarch of the Lorenzana family and the patriarch of DTO, members of the organization

rarely did anything significantly impacting the DTO without the Defendant's authorization.   It is

therefore the Defendant, who as the head of this DTO, is truly responsible for these large

quantities of cocaine being illegally trafficked into the United States.

As the Court is well aware, cocaine is an extremely dangerous and destructive illegal

drug.   Cocaine abuse has devastated communities in the United States, Colombia, and elsewhere, ruining lives, splitting families apart, inflicting violence on innocent by-standers, and wreaking havoc on innocent families and society at large.   It is also a very destabilizing and corruptive force in countries throughout the region that do not have strong enough law enforcement institutions to combat it, such as in Guatemala and Mexico, further adding to the destructive nature of the crime.   Its social costs have been enormous.   The Defendant's offense involved aiding and abetting individuals in Colombia and elsewhere who imported these drugs into the United States and it also involved the Defendant's direct participation in the importation of these drugs into the United States.

Furthermore, the Defendant's conduct is not fully encompassed by the sentencing enhancements already discussed.   As noted throughout the proffered testimony from the Government's witnesses, the Defendant and other members of his DTO consistently bribed public officials to provide protection and security for loads of cocaine being trafficked in Guatemala and to avoid criminal punishment for their actions, such as the Defendant's payment of a bribe to secure the release of his son, and co-defendant, Eliu from custody in 1999.   As the head of a large and powerful drug trafficking organization, the Defendant's bribery most likely contributed to the public corruption that plagues Guatemala to this day.   Additionally, the proffered testimony also demonstrates that the Defendant and members of the DTO clearly maintained several warehouses for the sole purpose of distributing and trafficking cocaine.[10]

---

[10]  As noted above, the Government believes that the 2009 U.S.S.G. are applicable in this case and accordingly has not applied specific offense characteristics such as bribing a public official (U.S.S.G. § 2D1.1(b)(1)) or maintaining a premises for the purpose of distributing a controlled substance (U.S.S.G. § 2D1.1(b)(12)).   While these sentencing enhancement cannot be applied in this case, the Defendant's activities throughout the course of the conspiracy highlight the serious nature of this offense.

This proffered evidence would clearly qualify for two additional two-point enhancements under the current Sentencing Guidelines pursuant to U.S.S.G. § 2D1.1(b)(1) and (b)(12).   This would increase the Defendant's total offense level to a level 45 and guidelines range of life.   The Government acknowledges that these enhancements should not be applied in this case as the 2009 Guidelines are the controlling guidelines in this case.   However, the inclusion of these enhancements in the current Sentencing Guidelines demonstrates how seriously the Sentencing Commission views conduct such as the Defendant's in this case.   Thus, the serious nature and circumstances of this offense necessitates a sentence of 324 to 405 months.

### 2.        Adequate Deterrence

Given the adverse impact that drug trafficking has on society and governments, it is important that the Court impose a sentence that deters others from undermining the rule of law. Further, while this prosecution has incapacitated some of the narcotics trafficking through Guatemala, importation of controlled substances from Guatemala and the region into the United States still occurs.   The recommended sentence would provide a critical general deterrence to other narcotics trafficking leaders that their participation in narcotics importation into the United States will result in substantial sentences.

### 3.        Protect the Public from Further Crimes of the Defendant

Prior to his arrest, the Defendant was a leader of a DTO responsible for trafficking significant quantities of cocaine to the United States over a period of many years.   After serving a prison sentence imposed by this Court, the Defendant will almost certainly be deported to Guatemala, where he has indicated a desire to return.   He will at that point be in a physical location where he could conceivably return to his criminal conduct, as he maintained significant influence over public officials in Guatemala, and members of his family and his DTO still reside

26

there.   Only a sufficient sentence under the guidelines will protect the public from the defendant

returning to criminal activity.

### 4.      The Need to Avoid Unwarranted Sentencing Disparities

Section 3553(a)(6) articulates "the need to avoid <u>unwarranted</u> sentence disparities among

defendants <u>with similar records</u> who have been found guilty of <u>similar conduct</u>."   18 U.S.C. §

3553(a)(6) (emphasis added).   By its terms, the statute requires a specific evaluation of the

compared defendants' records and conduct.   When determining whether a sentence creates an

unwarranted disparity, the Court should also consider a defendant's acceptance of responsibility,

the nature and extent of a defendant's participation in the criminal activity, a defendant's

criminal history, and whether and to what extent a defendant cooperated.   *See*, *e.g.*, *United

States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences

was "entirely explained" by co-defendant's acceptance of responsibility and thus any disparity

resulting from defendant's "harsher" sentence was not unwarranted).   A defendant is only

entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a

particular result."   *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

Moreover, in *United States v. Joseph*, 399 F. App'x 599 (D.C. Cir. 2010), the D.C.

Circuit determined that where the district court at sentencing conducted an appropriate

comparison of the sentences of <u>co-conspirators</u> in a single case, that comparison satisfied §

3553(a)(6).   *See also*, *Gall*, 552 U.S. at 54-55 (acknowledging as an acceptable practice the

comparison of sentences of co-defendants within the same conspiracy) ("[I]t seems that the judge

gave specific attention to the issue of disparity when he inquired about the sentences already

imposed by a different judge on two of Gall's co-defendants."); *United States v. Fernandez*, 443

F.3d 19, 31 n. 9 (2d Cir. 2006) ("The plain language of § 3553(a)(6) seems not to prohibit judges

from considering disparities between co-defendants").   In turn, the prevailing practice in the

D.C. Circuit has been to compare co-defendants within the same case for unwarranted sentencing

disparities rather than attempting to make comparisons to defendants in unrelated cases either

within the District or outside the District.   *See*, *e.g.*, *Mejia*, 597 F.3d at 1344; *United States v.*

*Colwell*, 304 F. App'x 885, 885-86 (D.C. Cir. 2008) (upholding sentence against § 3553(a)(6)

challenge on the basis of co-conspirators' criminal history category and number of fraudulent

transactions in which co-conspirators participated, how much co-conspirators contributed to

conspiracy's success, and crime to which each co-conspirator pled guilty); *United States v. Bras*,

483 F.3d 103, 114 (D.C. Cir. 2007) (finding no unwarranted sentencing disparity because

defendant and co-conspirators "did not hold comparable positions, either in the conspiracy or in

their workplaces" and co-conspirators "provided substantial assistance in the investigation of the

scheme, while [the defendant] did not").

In the instant case, the Defendant is not similarly situated to the majority of other co-

defendants, many of whom cooperated fully with the Government thereby earning reductions in

their sentences for their substantial assistance, a similarity that the Defendant does not share.

Furthermore, the evidence demonstrates that the Defendant was the leader of the DTO and is

therefore in a position where his conduct is not similar to the conduct of his subordinate co-

conspirators.   Under the unique circumstances of this case, the Government views co-defendant

William Eliu Martinez, and the Defendant's sons' Eliu and Waldemar as the only co-defendants

similarly situated in this case.   After trial, co-defendant Martinez received a sentence of 348

months from this Court on January 18, 2006.   After trial, Eliu received a sentence of life

imprisonment from this Court on February 28, 2018 and Waldemar received a sentence of life

imprisonment on May 10, 2018.   Thus, an advisory guideline sentence is appropriate and

reasonable in this case to avoid unwarranted sentencing disparities.

**E.**     **Any Mitigating Factors Identified in the PSR Do Not Warrant a Departure or Variance from the Applicable Guidelines Range**

The Government anticipates that the Defendant will request the Court depart or vary from the applicable guidelines range based on several factors listed in the PSR.   For example, the PSR indicates that the Defendant suffered from numerous medical ailments ranging from a heart attack in 2006, prior to his detention in this case; hernia; gout; sinusitis; elevated cholesterol; and other ailments.   *See* PSR ¶¶ 11-12.   While the Government is sympathetic to the Defendant's medical situation, these conditions are not so serious as to warrant a departure or variance from the applicable guidelines range.   Indeed, these conditions are routinely and successfully treated by Bureau of Prisons ("BOP") in the past and there's no reason to believe BOP will be unable to successfully treat upon the Defendant's designation.   Further, the Defendant bears the burden of proving by a preponderance of the evidence that he is eligible for a downward departure. *United States v. Goodwin*, 317 F.3d 293, 297 (D.C. Cir. 2003) *citing United States v. Sachdev*, 279 F.3d 25, 28 (1st Cir. 2002).

Moreover, the PSR indicates that the Defendant has been receiving more than acceptable medical care while in custody.   Indeed, the Defendant has been prescribed numerous medications that he appears to be responding.   Additionally, the Defendant has declined numerous medical screenings and procedures that have been offered to him while in custody. *See* PSR ¶ 12.   Further, this Circuit has recently upheld advisory guideline sentences finding the sentences not to be substantively unreasonable in light of a defendant's health problems. *See United States v. Carl*, 461 F. App'x 1, 2 (D.C. Cir. 2012) (citing *Rita v. United States*, 51 U.S. 338, 358, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007)).   In *Carl*, the court concluded that

other factors counterbalanced defendant's declining health, in particular, the defendant's conduct and seriousness of the offense.   Here, the seriousness of the Defendant's involvement in running a decades-long drug trafficking conspiracy involving tonnage quantities of cocaine being illegally imported into the United States clearly counterbalances any mitigation from the Defendant's medical ailments.   Thus, the Defendant's medical condition should not serve as a basis for the Court to grant a variance or departure from the advisory guidelines range.

Additionally, the Government anticipates that the Defendant will ask the Court to impose a sentence below the applicable Guidelines Range due to the Defendant's age.   The Sentencing Guidelines addresses a departure based on age and states that "characteristics may warrant a sentence outside the applicable guideline range if the characteristic, individually or in combination with other such characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."   U.S.S.G. § 5H1.1.   The facts and circumstances in this case do not warrant such a departure.   Here, the Defendant's age is not to such an usual degree as to necessitate a departure.   Rather, the serious nature of the offense, the Defendant's dominant role as the patriarch of this DTO, the use of public corruption, all militate towards a guidelines sentence of 324 to 405, and not towards a departure due to the Defendant's age.

Further, the Introductory Comments immediately preceding U.S.S.G. § 5H1.1 note the relevance of certain specific offense characteristics at sentencing, such as age.   It specifically notes that the purpose in examining these offense characteristics is "to provide sentencing courts with a framework for addressing specific offender characteristics in a reasonably consistent

manner.   Using such a framework in a uniform manner will help 'secure nationwide consistency,' *see Gall v. United States*, 552 U.S. 38, 49 (2007), 'avoid unwarranted sentencing disparities,' *see* 28 U.S.C. § 991(b)(1)(B), 18 U.S.C. § 3553(a)(6), 'provide certainty and fairness,' *see* 28 U.S.C. § 991(b)(1)(B), and 'promote respect for the law,' *see* 18 U.S.C. § 3553(a)(2)(A)."   *See* U.S.S.G. Chapter Five, Introductory Comments.

This Circuit also previously upheld a guideline 324 month sentence for a defendant convicted of conspiracy to distribute cocaine, crack cocaine and heroin, despite the fact that the defendant was "quite along in age" and his declining health.   *See United States v. Law*, 528 F.3d 888, 902 (D.C. Cir. 2008).   Here, should the Court depart downward based on the Defendant's age, it would create unwarranted sentencing disparities with other co-defendants.   It would also, in essence, reward the Defendant for successfully trafficking tons of cocaine through Guatemala for decades without getting arrested and extradited to the United States until he was over 80 years old.[11]

In sum, while the Defendant may argue that there are some mitigating circumstances that warrant a downward departure, these circumstances do not outweigh the overwhelming aggravating factors in this case as discussed above.   The Defendant's role in this long standing, large scale, international drug trafficking conspiracy necessitate a guidelines sentence of 324 to 405 months.   Thus, such a sentencing departure is not appropriate in this case and should not be granted.

---

[11]  It is also of note that the Defendant fought extradition for approximately three years, which further contributed to his advanced age at the time of sentencing in this case.

IV.     **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court sentence the Defendant to a term of imprisonment within the applicable Sentencings Guideline range of 324 to 405 months, as calculated by the PSR, which is reasonable, appropriate and matches the severity of the crimes committed by the Defendant in this case.   The Government submits that a sentence including a 324 to 405 months term of imprisonment is sufficient, but not greater than necessary, to punish the Defendant for his crime, promote respect for the law, deter the Defendant and others from committing similar serious crimes in the future, and protect the public.

Respectfully submitted,

ARTHUR WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:     /s/ Emily R. Cohen
Emily R. Cohen
Anthony Aminoff
Brett Reynolds
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice
145 N Street, NE
Washington, DC 20530
(202) 616-2471
Emily.Cohen@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day of September 6th, I served the Defendant a copy of this filing via his defense counsel of record, Angel Eduardo Balarezo and Joaquin Perez, via ECF.

/s/ Emily R. Cohen
Emily R. Cohen
Anthony Aminoff
Brett Reynolds
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE
Washington, DC 20530
(202) 616-2471
Emily.Cohen@usdoj.gov