UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| UNITED STATES OF AMERICA | ) | CRIMINAL NO.: 03-CR-331 (CKK) |
|---|---|---|
| | ) | |
| v. | ) | |
| WALDEMAR LORENZANA-LIMA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**GOVERNMENT'S MOTION FOR SENTENCING ENHANCEMENTS**

**I. INTRODUCTION**

The Government respectfully submits this Motion in advance of sentencing of Waldemar Lorenzana-Lima (the "Defendant"), which is currently scheduled for November 6, 2019 at 9:30 a.m. For the reasons set forth below, the Government respectfully moves the Court to impose, pursuant to the Sentencing Guidelines, a four-level enhancement for leadership and a two-level enhancement for use of an aircraft in calculating the Defendant's guideline range pursuant to 18 U.S.C. § 3553(a)(4).

**II. BACKGROUND[1]**

**A. Procedural History**

On March 10, 2009, a federal grand jury sitting in this district returned an Indictment against the Defendant charging violations of 21 U.S.C. §§ 952, 959, 960, 963, and 960(b)(1)(B)(ii) and 18 U.S.C. § 2. The Defendant was arrested in Guatemala on April 26, 2011, and was extradited to the United States on March 18, 2014. The Defendant made his

---

[1] This Motion includes a brief summary of the procedural history and the Defendant's conduct, both of which are detailed further in the Government's Sentencing Memorandum. *See* Dkt. No. 1095. The Government incorporates herein by reference the procedural history and summary of the Defendant's conduct detailed in that Memorandum. *See id.*

initial appearance on March 20, 2014, and pleaded guilty on August 18, 2014 to the lesser included offense of 21 U.S.C. §§ 952, 959, 960 and 963. From January 22, 2015 until March 29, 2019, the Defendant underwent multiple court-ordered psychiatric evaluations and on July 8, 2019, in light of the findings of competency and the Defendant's voluntary concession thereto, the Court scheduled sentencing for September 19, 2019. On September 10, 2019, the Court re-scheduled sentencing for November 6, 2019.

On September 5, 2019, the Government informed the court of a disputed issue regarding whether the Government must present witnesses in support of its recommended sentencing enhancements for leadership and use of an aircraft. *See* Order, Dkt. No. 1094. The Government requested that the Court permit the parties to rely on their sentencing memorandums and factual proffers. *Id.* at 1. The Defendant requested that the Court require the Government to present witnesses in support of its recommended enhancements. *Id.* The Court held that in lieu of live witnesses, the Government could rely on trial testimony from the Defendant's co-defendants in support of its recommended sentencing enhancements for leadership and use of an aircraft. *Id.* at 2. The Court also requested that the Government file a motion in support of its recommended sentencing enhancements, accompanied by a copy of the trial transcript excerpts on which it intends to rely. *Id.*

### B. **Defendant's Conduct**

During the course and in furtherance of the charged conspiracy, the Defendant was a leader of a drug trafficking organization ("DTO") which, from in or about March 1996 and continuing until at least November 2007, received, inventoried and stored large quantities of cocaine from Colombia that would later be imported into Mexico, and ultimately, into the United

2

States for further distribution. PSR ¶ 6. Some of this cocaine would arrive in El Salvador via "go-fast" boats from Colombia and was then smuggled into Guatemala by land. *Id*. The DTO also used cocaine-laden aircraft that would land on clandestine airstrips located on or near properties owned and utilized by the DTO. *Id.* The DTO, including the Defendant, received, inventoried, stored, and further distributed the cocaine for importation into the United States. PSR ¶ 7. The Defendant was paid a fee for each shipment of cocaine that members of the conspiracy received, stored, transported and sold on the Defendant's properties or those of his DTO co-conspirators during the conspiracy. *Id*. Members of the DTO would then sell the cocaine to Mexican drug traffickers in Guatemala knowing or intending that it would be further distributed to the United States. *Id*. The Defendant directed where shipments of cocaine would be stored in Guatemala for further distribution and directed the actions of co-conspirators, including his sons. *Id*. At other times during the time period of the charged conspiracy, the Defendant allowed his sons to take the lead in planning and organizing the drug shipments; however, the Defendant continued to receive a portion of payments his sons and co-conspirators received during the course of the conspiracy. *Id*. The total amount of cocaine involved in this drug trafficking activity well exceeded 450 kilograms of cocaine. PSR ¶ 8.

## III.  LEGAL STANDARD

### A.  **Leadership Enhancement**

Section 3B1.1(a) of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") requires the Court to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). This enhancement must be supported by

3

the preponderance of the evidence, *see United States v. Thomas*, 114 F.3d 228, 261 (D.C. Cir. 1997), but such evidence may be circumstantial, *see United States v. Layeni*, 90 F.3d 514, 524 (D.C. Cir. 1996). To determine whether a defendant is an organizer or leader rather than a manager or supervisor, the Application Notes to the Guidelines explain that a sentencing court should consider the following factors:

> [T]he exercise of decision making authority, the nature of participation in the commission if the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offence, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, App., Cmt. n. 4.

A four-level sentencing increase is appropriate if the defendant exercises control over one or more participants in a criminal activity that involves five or more participants. *See United States v. Quigley*, 373 F.3d 133, 139–40 (D.C. Cir. 2004) (finding the defendant had no control over the participants of a housing scheme); *United States v. Wilson*, 240 F.3d 39, 49 (D.C. Cir. 2001) (finding the number of persons involved must total at least five).[2] But a defendant eligible for the enhancement does not need to have exercised control over each participant in the conspiracy. *See United States v. Batista*, 684 F.3d 333, 346 (2nd Cir. 2012) (stating that the defendant's control over one person, who gave orders to lower-ranked members, still justified a

---

[2] A sentencing court may also count the defendant among one of the five or more participants necessary to support a 4-level enhancement under § 3B1.1. For example, in *United States v. Brodie*, the D.C. Circuit affirmed the four-level leader or organizer enhancement, counting the defendant and four other participants who carried out the defendant's criminal activity. *See* 524 F.3d 259, 270 (D.C. Cir. 2008) (reasoning that one individual prepared false financial documents, one appraised properties, and two others submitted false loan applications). Similarly, in *United States v. Yeh*, the court noted that had the defendant objected to the district court's failure to make factual findings to support a four-level enhancement, the court could easily have cited the five perpetrators, including the defendant. 278 F.3d 9, 14 (D.C. Cir. 2002).

four-level sentencing increase). And, the D.C. Circuit has explained that the greater a defendant's level of control or responsibility, the more culpable the defendant is, justifying a larger sentence and imposition of the four-level enhancement. *United States v. Graham*, 162 F.3d 1180, 1185 (D.C. Cir. 1998) (distinguishing between defendants based on "relative responsibility").

Additionally, the leadership enhancement can be warranted where a defendant exercises decision making authority, enjoys a larger share of the profits than others in the criminal scheme, and recruits other participants to the activity. *United States v. Baylor,* 97 F.3d 542, 548 (D.C. Cir. 1996) (finding the defendant "exercised control over and organized the activities of at least one other person involved in distributing drugs"); *United States v. Kelley,* 36 F.3d 1118, 1129 (D.C. Cir. 1994) (finding the defendant recruited participants and took all the proceeds from the scheme). For example, in *United States v. Olejiya*, the D.C. Circuit affirmed imposition of the leadership enhancement where a defendant exercised control by supervising other participants' trips to cash fraudulent checks and collected money from other participants. 754 F.3d 986, 991–92 (D.C. Cir. 2014).

### B. Use of Aircraft Enhancement

Section 2D1.1(b)(2)(A) of the Sentencing Guidelines provides that the sentencing court should increase a defendant's offense level by two levels "[i]f the defendant unlawfully imported or exported a controlled substance under circumstances in which (A) an aircraft other than a regularly scheduled commercial air carrier was used to import or export the controlled substance . . ." The evidence adduced at trial clearly supports the application of the enhancement for use of an aircraft pursuant to U.S.S.G. §2D1.1(b)(2)(A). Courts have applied Section 2D1.1(b)

5

when drug traffickers have used private planes to pick up drugs from one country and deliver it to another country as the plain meaning of the text of the guideline allows the aircraft to be "used" to import drugs even if the aircraft is not used to move the drugs across the American border. *See* Order, Dkt. No. 991. For example, in *United States v. Iacullo* "a private plane was used several times to pick up cocaine in Colombia and fly it to the Bahamas, while the cocaine was en route to this country," and the court found that under these circumstances "it is clear that a private plane 'was used,' within the meaning of §2D1.1(b)(2)(A), during the importation scheme, of which [defendant] was an active participant." *United States v. Iacullo*, 140 F. App'x 94, 102 (11th Cir. 2005).

## IV. ARGUMENT

### A. The Defendant Should Receive a Four-level Sentencing Increase Because He Qualifies as the DTO's Leader or Organizer

The Defendant's conduct qualifies for application of the leadership role adjustment because he had significant decision making authority over a DTO that involved five or more participants, was deeply involved in the offense, and recruited other members. Specifically, at the trial of co-defendants Waldemar Lorenzana-Cordon and Eliu Lorenzana-Cordon, the Defendant's sons, the evidence showed that the Defendant was the organizer and leader of the Lorenzana DTO, a sophisticated and expansive international drug trafficking organization comprised of more than five individuals, including Otto Herrera-Garcia, Byron Linares-Cordon, and the Defendant's three sons, among others. The Defendant engaged in high-level negotiations and decision-making about the direction and investments of the conspiracy. The trial evidence showed that the Defendant exercised substantial decision making authority and gave orders and instructions to his sons and others as to where and when loads of cocaine should

be received, inventoried, and stored so as to avoid law enforcement detection. Both Herrera-Garcia and Byron Linares-Cordon acknowledged the Defendant as the leader of the DTO and largely deferred to him. Herrera-Garcia would not engage in any new trafficking endeavor, such as a substantial effort to traffic cocaine, via El Salvador, using maritime shipping routes, without express permission from the Defendant. Even when Herrera-Garcia had meetings without the Defendant, the sons would wait to make decisions until they discussed the venture with their father, the Defendant, and ultimately received his permission.

For example, starting in approximately 1995, when Herrera-Garcia met with the Defendant's son, Haroldo, and told him about a proposition involving Mexican traffickers requesting property to land cocaine laden aircraft and store cocaine, Haroldo responded that he was very interested but that had to ask his father, the Defendant, before agreeing to the business proposition. *See* Trial Tr. ("Tr.") 3/1/16 p.m. at 26–31 (Ex. 1).[3] Herrera-Garcia realized that he needed permission from the Defendant and accepted an invitation to Easter dinner at the Defendant's property so he (Herrera-Garcia) could relay the same proposal directly to the Defendant. *See id*. at 29–31 (Ex. 1). The Defendant told Herrera-Garcia he needed to think about it and ultimately the Defendant provided his assent to the proposal. *Id.* at 31 (Ex. 1).

With the Defendant's express authorization, Herrera-Garcia worked with Defendant's sons Haroldo, Waldemar Jr. and Eliu, to traffic cocaine through the Lorenzana properties in Guatemala. While Herrera-Garcia and the sons had roles related to planning and logistics, the

---

[3] All citations to the trial transcripts in *United States v. Eliu Lorenzana-Cordon and Waldemar Lorenzana-Cordon*, No. 03-cr-331 (D.D.C.), are referenced herein using this same citation format. Pursuant to the Court's Order, the Government relies herein solely on trial testimony from co-defendants, rather than additional information provided to the Government in proffer sessions but not adduced at trial. The relevant excerpts of these transcripts are attached hereto as exhibits.

Defendant authorized the work, and designated what property would receive the plane or trucks and store the cocaine. As Herrera-Garcia testified, "the only requirements from him [the Defendant] was that he would - - he would call the day. He would call the day and he would let us know when it could be done." *Id.* (Ex. 1). In other words, the Defendant had the power and authority to "require[]" that Herrera-Garcia, the Defendant's sons, and others wait for the Defendant to "let [them] know" when they could engage in trafficking related activities in furtherance of the DTO. *Id.* (Ex. 1). As Herrera-Garcia's testimony shows, he knew that he needed the Defendant's express consent prior to conducting business with the Lorenzana's sons at the various Lorenzana properties. Herrera-Garcia testified that despite the Defendant's absences on site, the Defendant exercised extensive managerial oversite of the DTO as:

> the pitch came through their father . . . it's like he [the Defendant] knew there was enough work that could be spread in between all of them, and that's how we - - in between him and me, Waldemar Lorenzana Senior and myself agreed to start moving the jobs in between them [Eliu, Haroldo, and Waldemar Jr.].

Tr. 3/3/16 p.m. at 64–65 (Ex. 2). This trial testimony, among other evidence detailed herein, demonstrates that it was the Defendant who was "devising a criminal scheme, providing the wherewithal to accomplish the criminal objective, and coordinating and overseeing the implementation of the conspiracy." *United States v. Valdez-Arieta*, 127 F.3d 1267, 1272 (10th Cir. 1997).

Herrera-Garcia additionally showed the Defendant great deference in a manner that demonstrated that Herrera-Garcia viewed the Defendant as the leader of the DTO. For example, in approximately 1998, during a period in which the DTO was engaging in extensive trafficking through aircraft flights, the Mexicans wanted to increase the frequency and amounts of cocaine

8

shipments moving through the Lorenzana properties, and Herrera-Garcia informed Haroldo of this request. *See* Tr. 3/1/16 p.m. at 36–42 (Ex. 3). But Haroldo himself could not assent to the request alone. As Herrera-Garcia testified, Haroldo indicated that "he [Haroldo], once again, told me that we needed to talk to his father." *Id.* at 37 (Ex. 3). Later, once the aerial operations commenced, Herrera-Garcia approached the Defendant and the Defendant expressed concerns about the increased traffic at the Lorenzana family property known as *Los Canas*, and suggested they slow down and find a better place to restart the operations. *See id.* at 37–41 (Ex. 3). Hererra-Garcia heeded the Defendant's instruction and he, the Defendant, and Haroldo began searching and visiting other suitable Lorenzana properties. *See id.* (Ex. 3) Shortly after starting operations at the new location, an airplane loaded with cocaine crashed at the property and the Defendant ordered operations to cease until they could find a new spot. *See* Tr. 3/1/16 p.m. at 48–51 (Ex. 4). The Defendant indicated that he "was not very happy" and "didn't like the way things were handled" and "advised me [Otto-Herrera] and Haroldo that we could not do anything else in the area." *Id.* at 48–49 (Ex. 4). Herrera-Garcia acknowledged the Defendant's leadership and control over the area, and rather than ignore the Defendant's words or try working with another son, "follow[ed] his—you know, his advice. We slowed down and once again started looking for more options to see if we could find a different airfield." *Id.* (Ex. 4).

The Defendant also dictated what sons Herrera-Garcia should work with for future shipments. Specifically, the Defendant instructed Herrera-Garcia "that if things were going to be done around the area, he wanted him [Eliu] more involved so that he could make sure that things were going to be done correctly" and so "things would work a little better." *See id.* at 50–51 (Ex. 4). While the Defendant was not present at many of the operational meetings,

9

Herrera-Garcia indicated that "it was discussed with him [the Defendant] that we were going to work there [*Los Conejos*]." *Id.* at 51 (Ex. 4).

This deference to the Defendant continued during an El Salvador operation focused on maritime shipments.[4] For example, prior to starting this maritime operation, Herrera-Garcia once again discussed this new route with the Defendant and sought his express permission. *See* Tr. 3/2/16 a.m. at 15 (Ex. 5). Herrera-Garcia testified that he:

> again went to speak to Haroldo and his father. And kind of run it through them, you know, the option that we were having, and that there was going to be a possibility of work coming from El Salvador, and that their locations were very important for this operation to take place.

*Id.* (Ex. 5). The Defendant also decided which son was to receive the load of cocaine and to which property Herrera-Garcia was to coordinate delivery of the cocaine. *See* Tr. 3/2/16 a.m. at 24–27 (Ex. 6). For example, the Defendant decided against using Haroldo's property *La Calera* and "the [Defendant's] suggestion was for me to inspect an old warehouse that they had in a location that they called *El Llano*." *Id.* at 24–25 (Ex. 6). The Defendant and Herrera-Garcia went to *El Llano* to inspect the property and determine its suitability for receiving and storing loads of cocaine. *See id.* at 24–26 (Ex. 6). The Defendant showed Herrera-Garcia structures as possible locations to receive and store the cocaine, and "it was instructed by Waldemar, Sr., that the warehouse was being remodeled to the size that I [Herrera-Garcia] needed it." *Id.* at 25–26 (Ex. 6). Further, as a result of these meetings:

> it was established that, basically there was change on who things were going to be done with or it was decided [by the Defendant and Herrera-Garcia] that if any shipment came into *El Llano*, they would directly be handled by Eliu Lorenzana. Anything that had to do with *La Calera* had to with Haroldo. And the agreement was that whatever amount of cocaine that

---

[4] From approximately 1999 until 2002, the DTO received shipments of cocaine in El Salvador via go-fast boats that were inventoried and then transported to the Lorenzana warehouses.

> came into their warehouses, whatever amount was going to the Mexican cartels would go, they would store and safeguard, and then it would be picked up by the Sinaloa Mexican cartel. What was left of the shipment would be turned into them for them to sell.

*Id.* 27 (Ex. 6). Again, the Defendant was present for every important decision regarding the El Salvador operation. And the trial testimony showed that it was the Defendant who ultimately approved the family's involvement, and the Defendant was the person to approve the precise property and modifications. While Haroldo attended the initial meeting about the maritime operation, and Eliu attended the subsequent meeting, the Defendant attended *both* meetings as the leader of the DTO with sole responsibility to make high-level executive decisions.

Further, the Defendant was the leader of a sophisticated operation. The Defendant's DTO was trafficking tonnage quantities of cocaine from Colombia to Guatemala through various locations. As shown at trial, the Defendant's DTO utilized planes, maritime vessels, trucks, landing strips, and warehouse storage facilities. The large quantities of cocaine that the Defendant and his DTO successfully trafficked from Colombia to Guatemala were then transported into Mexico and then into the United States for further distribution. The DTO was so extensive in that it was necessary to have an accountant, Linares-Cordon, maintain all of its drug and financial transactions, which equated to millions of dollars. *See* Tr. 3/2/16 a.m. at 34–35 (Ex. 7).

For example, starting with the *Las Canas* aerial shipments in approximately 1997, Herrera-Garcia agreed to pay Haroldo and the Defendant five percent of the shipment in United States dollars, which generally consisted of at least 450 kilograms of cocaine. *See* Tr. 3/1/16 p.m. at 32–35 (Ex. 8). Herrera-Garcia testified that the Lorenzanas received shipments at *Las Canas* at least ten times. *See id.* at 35 (Ex. 8). Around 1998, Herrera-Garcia used another

11

Lorenzana property, *La Melonera*, and the DTO unloaded a Piper Navajo airplane that carried approximately 600 kilograms. *See* Tr. 3/1/16 p.m. at 42 (Ex. 9). The same year, Herrera-Garcia incorporated another Lorenzana property *Los Conejos*, where the DTO unloaded a Cessna 206 airplane that carried approximately 450 kilograms. *See id.* at 52 (Ex. 10). For these shipments, Herrera-Garcia followed the same previous terms but increased the percentage to eight to ten percent of the shipment. *See id.* at 56 (Ex. 11).

Around 1999, Herrera-Garcia and the Lorenzanas began the El Salvador maritime operation, which would move approximately 2,000 kilograms per shipment, once or twice per month from 1999 to 2002. *See* Tr. 3/2/16 a.m. at 15, 64 (Ex. 12). For this service, Eliu collected 50 to 100 dollars per kilogram for warehousing and safeguarding the kilograms at *El Llano*.[5] *See id.* at 28 (Ex. 13). Herrera-Garcia testified that during the El Salvador operation, 1999 to 2002, he stored thousands of kilograms of cocaine at both Eliu and Waldemar Jr.'s properties and observed millions in United States currency at Waldemar Jr., Haroldo, and Eliu's farms; all drug proceeds which were ultimately transported to his (Herrera-Garcia's) safe house in Zona 14. *See* Tr. 3/2/16 p.m. at 33–34, 94 (Ex. 14). Linares-Cordon also testified about the extensiveness of the conspiracy and said "we're talking about over 20,000 kilos of cocaine at a price of 5400 to 5500 per kilo. We're talking about over a hundred million dollars." Tr. 2/23/16 p.m. at 47 (Ex. 15). Further, the Lorenzanas also sold cocaine to their own customers as 60 percent of the cocaine went directly to the Sinaloa Cartel and the other 40 percent went to the Lorenzanas. *See* Tr. 3/2/16 a.m. at 31 (Ex. 16).

As discussed above, the Defendant was aware that his sons sold cocaine to their own

---

[5] As production increased during the El Salvador operation, the DTO delivered and warehoused cocaine at Waldemar Jr.'s property *La Finquita*. *See* Tr. 3/2/16 a.m. at 84 (Ex. 17).

customers as during the negotiation with Herrera-Garcia, he (the Defendant) specifically decreed that the leftover cocaine be distributed amongst the sons. *See infra* at 10–11. Further, while Herrera-Garcia made payments directly to the owner of the property, the Defendant undoubtedly received a percentage of the profits as the Defendant presided over the preliminary meetings with Herrera-Garcia and dictated the terms of engagement. *See* Tr. 3/1/16 p.m. at 34, 48, 56, 59 (Ex. 18) (discussing payments to Haroldo); Tr. 3/2/16 a.m. at 28 (Ex. 13) (discussing payments to Eliu).

Also, the Defendant demonstrated his leadership through his connections to law enforcement, which helped facilitate the DTO's illegal trafficking. For example, Herrera-Garcia testified about an incident in which Eliu was arrested in 1999 in La Maquina, Guatemala with weapons while for waiting for a load of cocaine to be delivered. Tr. 3/1/16 p.m. at 81–82 (Ex. 19). The Defendant told Herrera-Garcia that "he [the Defendant] was already doing what he had to do. He was already - - I think he was already on his way over to try to resolve the situation, and he told me not worry about it, that he would take care of it." *Id.* at 82 (Ex. 19). Herrera-Garcia ultimately gave the Defendant money for the payment to the police "to resolve the situation," meaning "to pay off the authorities, to get Eliu and the other guys out of jail." *Id*. (Ex. 19)

Such trial testimony leaves little doubt that the Defendant was the leader of the family and its narcotics trafficking empire. This conclusion is not undermined by any contention by the Defendant that his sons were the leaders of the DTO , or that the DTO had multiple leaders, as U.S.S.G. § 3B1.1 specifically provides that there can be more than one person who qualifies as a leader or organizer of a criminal organization for purposes of the sentencing guidelines

enhancement. *See* U.S.S.G. § 3B1.1, App. Note 4. Further, while the sons may have been leaders over their own smaller cells and sub-groups within the DTO, under binding precedent that fact would not diminish the Defendant's more expansive authority over the broader DTO. For example, in *Yeh*, 278 F.3d at 13, the defendant was one of several leaders and was an enforcer for a particular vessel importing drugs into the United States. The defendant claimed that he could not have been a leader because others had responsibility on the ship and he was not alone in his capacity to lead. *Id*. The D.C. Circuit held that while the defendant shared leadership power with others, they were still subordinate to the defendant. This case is analogous. While the Defendant's sons handled many of the day-to-day operations, the trial testimony showed that the Defendant generally made the final decisions. Indeed, one would *not* necessarily expect a leader or organizer to have precise control over the details of the daily operations. The Defendant chose which sons and which properties would be used for various elements of the enterprise, and much like the defendant in *Yeh*, the Defendant had ultimate authority over the DTO's properties.

The Defendant may also argue that the evidence does not conclusively demonstrate his leadership of the DTO over the entire length of the charged conspiracy. But by its plain language, U.S.S.G. § 3B1.1 does not require that a defendant be the leader of every aspect of the criminal enterprise, or that the defendant act as the leader for the entire duration of the charged conspiracy. Indeed, as the Sentencing Guidelines' application notes explain, more than one person can qualify as a leader or organizer for purposes of applying the § 3B1.1 enhancement, and sentencing courts should consider "all persons involved" during the "course of the entire offense." U.S.S.G. § 3B1.1, App. Note 4.

Here, the Defendant played a significant role in the DTO, as evidenced by Herrera-Garcia seeking his express permission to operate, and the Defendant's direct involvement in the conspiracy at its genesis. Over time, the Defendant decided which of his lieutenants and which of his properties would be used to further the goals of the criminal enterprise, and his word was required for the DTO to act. As Herrera-Garcia put it, "he would call the day." Thus, the Defendant "coordinated the group's efforts and directed the group in the performance of their respective tasks." *Brodie*, 524 F.3d at 270; *see also United States v. Fields*, 242 F.3d 393, 398 (D.C. Cir. 2001) (holding that the defendant was a leader when he enlisted members to assist him in distributing controlled substances and directed, procured, and participated in acts of violence against rival drug groups). The Defendant's extensive participation and control in the drug shipments was especially evident at critical junctures in the conspiracy; the beginning of the aerial shipments and the El Salvador operation. Given the facts, the Defendant's involvement as a leader was significant, extensive, and would qualify him as a leader considering the totality of the circumstances. Therefore, the four-level role adjustment is clearly warranted and should be applied in this case.

### B. The Defendant Should Receive a Two-Level Sentencing Increase Because His DTO Used Aircraft During the Conspiracy

The Defendant's conduct qualifies for a use of an aircraft specific offense characteristic because his DTO extensively used aircrafts to move tonnage quantities of cocaine. First, the Defendant admitted in his signed Statement of Facts that his drug trafficking organization utilized airplanes through-out the course of their trafficking loads of cocaine from Colombia to Guatemala. *See* Statement of Facts, Dkt. No. 501, (August 18, 2014). Moreover, the evidence shows that for years the DTO used aircraft as part of an overall scheme to import cocaine into the

United States.  Linares-Cordon testified about numerous shipments in the early 1990s, when he served as a lookout while Haroldo was receiving cocaine shipments at various locations in Guatemala.  *See* Tr. 2/23/16 a.m. at 100–102 (Ex. 20).  Linares-Cordon also knew that the Lorenzanas continued to receive limited aerial shipments from 2001 until 2003, even during the El Salvador operation and referenced entries in his narcotics ledger.  *See* Tr. 2/23/16 p.m. at 19–20 (Ex. 21).  For example, Linares-Cordon indicated that the ledger note of "$3,788,090" in United States currency referred to profits from aerial shipments that law enforcement recovered from a car, some of which were attributable to the Lorenzana's DTO.  *Id.* at 19 (Ex. 21). Linares-Cordon testified that while only "two or three" of the shipments were stored at the Lorenzana's property, each of these shipments consisted of "between a thousand and a thousand five hundred kilos per flight."  *Id.* at 20 (Ex. 21).

In fact, the evidence shows that Herrera-Garcia's entire relationship with the Lorenzanas started because he needed suitable land for incoming aircraft.  Specifically, Herrera-Garcia testified that the Mexican traffickers requested a "person that could provide an airfield property where we could store and safeguard cocaine shipments and be able to secure them until the Mexican drug traffickers could come pick them up."  Tr. 3/1/16 p.m. at 26–31 (Ex. 1).  Those "airfield propert[ies]" requested by the Mexican traffickers would ultimately turn out to be the Defendant's DTO's properties.  *Id.* (Ex. 1).  Further, Herrera-Garcia's testimony clearly showed that the Defendant knew how his property would be used:

> an airplane leaves Colombia illegally with a load of cocaine.  We provide a landing field in Guatemala where the airfield [sic] lands, and then off-load the shipment of cocaine, refuel the airplane, send the airplane back to Colombia, and we then proceed to store and safeguard the shipment for whatever time it takes for the drug - - Mexican drug traffickers to stop by and pick it up.

16

*Id.* at 30 (Ex. 1). Herrera-Garcia explained that according to the proposal, the Lorenzanas would provide "the airfield . . . the property to safeguard the cocaine . . . [and] make sure it [the cocaine] was secure." *Id.* (Ex. 1). The Defendant told Herrera-Garcia he needed to think about it and ultimately consented to the proposal. *See id.* at 31. (Ex. 1)

The use of aircraft was a frequent subject of conversation between Herrera-Garcia and the Defendant. For example, in approximately 1998, during the aerial operations, the Mexicans wanted to increase the frequency and amounts of cocaine shipments and Herrera-Garcia spoke to the Defendant about it. *See* Tr. 3/1/16 p.m. at 36–42 (Ex. 3). The Defendant expressed concerns about the increased aerial traffic at the property and he, Herrera-Garcia, and Haroldo began searching and visiting other suitable Lorenzana properties. *See id.* at 37–41 (Ex. 3). The Defendant knew that Hererra-Garcia was using their properties for airplane shipments as he was present when they inspected a variety of Lorenzana properties and ultimately decided the most suitable property. *See id.* (Ex. 3). Herrera-Garcia testified "we inspected the first area in the Lorenzanas properties that they call *El Llano*, and it was too small. It didn't meet the requirement for the airfield." *Id.* at 39 (Ex. 3) The Defendant, Herrera-Garcia, and Haroldo decided to use another Lorenzana property, *La Melonera* as "we were going to use one of the roads, one of the dirt roads, accommodated, you know, for an air strip and use it for landing an aircraft." *Id.* at 40–41 (Ex. 3). The Defendant knew that the aerial operations at *La Melonera* occurred after an airplane crashed at the property and the Defendant ordered operations to temporarily cease until they could find another location. *See* Tr. 3/1/16 a.m. at 48–51 (Ex. 4). Herrera-Garcia testified that they "slowed down and once again started looking for more options to see if we could find a different airfield" and Herrera-Garcia, the Defendant, and Haroldo

17

decided to use another property, *Los Conejos*, after Herrera-Garcia "did an inspection, make sure that the airfield was - - you know, was appropriate for the job." *Id.* at 49–50 (Ex. 4). Even as the Defendant shifted some of the aerial shipments to other properties, Herrera-Garcia clearly articulated how the properties would be used stating, "that the airplane, of course, was going to come. We were to off-load the airplane, refuel, put the cocaine on a truck so it could be moved back to La Reforma." *Id.* at 51 (Ex. 4). Even if the Defendant was not present at on-site meetings, Herrera-Garcia indicated that "it was discussed with him [the Defendant] that we were going to work." *Id.* (Ex. 4)

The Defendant cannot claim ignorance as to the use of aircraft as Herrera-Garcia and Linares-Cordon testified extensively about the cocaine-laden aircrafts landing at airstrips owned or controlled by the Defendant and his DTO. *See United States v. Bethancourt*, 65 F.3d 1074, 1080–1081 (3rd Cir. 1995) (affirming the application of the aircraft enhancement despite the defendant's argument that it was not foreseeable or in furtherance of the conspiracy). At trial, Herrera-Garcia detailed numerous conversations with the Defendant about the airstrip requirements and the need for additional properties that could handle the increased traffic. The evidence supports the fact that aircraft were used as part of the drug trafficking scheme that the Defendant participated in and orchestrated. Therefore, the application of this enhancement is clearly supported by both the witness testimony as well as the Defendant's own signed Statement of Facts.

## IV. **CONCLUSION**

An enhancement for being an organizer and leader of a drug conspiracy involving five or more participants under U.S.S.G. § 3B1.1(a) applies because the evidence established the Defendant's role as a leader that had significant decision-making authority over workers in the

organization. A two-level enhancement for use of an aircraft other than a regularly-scheduled commercial air carrier to import controlled substances under U.S.S.G. § 2D1.1(b)(2)(A) applies because evidence established that the Defendant and his co-conspirators used private aircraft during the conspiracy to import multi-hundred kilogram quantities of cocaine, which was stored at the Defendant's properties.

Respectfully submitted,

ARTHUR WYATT, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By: /s/ Emily R. Cohen
Emily R. Cohen
Anthony Aminoff
Brett Reynolds
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
United States Department of Justice
145 N Street, NE
Washington, DC 20530
(202) 616-2471
Emily.Cohen@usdoj.gov

**CERTIFICATE OF SERVICE**

        I hereby certify that on this day of September 11th, I served the Defendant a copy of this filing via his defense counsel of record, Angel Eduardo Balarezo and Joaquin Perez, via ECF.

        /s/ Emily R. Cohen
Emily R. Cohen
Anthony Aminoff
Brett Reynolds
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
145 N Street, NE
Washington, DC 20530
(202) 616-2471
Emily.Cohen@usdoj.gov