| | | |
|---|---|---|
| **UNITED STATES** | : | |
| | : | |
| **v.** | : | |
| | : | **CRIMINAL NO. 03-331(CKK)** |
| **WALDEMAR LORENZANA,** | : | |
| | : | **SENTENCING: 2/11/20** |
| *Defendant.* | : | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Defendant Waldemar Lorenzana ("Lorenzana"), by and through his undersigned counsel, respectfully submits this Memorandum in Aid of Sentencing. Mr. Lorenzana will come before the Court on February 11, 2020, for sentencing after pleading guilty to a lesser included offense of Count 1, conspiracy to import 500 grams or more of cocaine into the United States and to manufacture and distribute 500 grams or more of cocaine, intending and knowing that the cocaine would be unlawfully imported into the United States in violation of 21 U.S.C. §§ 952, 959, 960 & 963. For the reasons set forth below, Mr. Lorenzana respectfully requests that the Honorable Court reject the government's request for a sentence of 324 – 405 months (27 – 33 years), an effective life sentence, and sentence him to a term of 120 months.

## OBJECTIONS TO THE PRESENTENCE REPORT

Mr. Lorenzana has reviewed the pre-sentence report ("PSR") and has noted several objections to the PSR writer.

## STATUTORY AND GUIDELINE ANALYSIS

The offense of conviction carries a mandatory minimum term of 5 years and a maximum of 40 years of imprisonment, along with at least 4 years of supervised release and a fine of up to $2,000,000.

The PSR calculated and the government requests that the Court find the Guidelines as follows:

| | |
|---|---|
| Base Offense Level | 38 |
| Adjustment for Role in Offense (leader/organizer) | +4 |
| Specific Offense Characteristic (use of aircraft) | +2 |
| Adjustment for acceptance of responsibility | -3 |
| Adjusted offense level | 41 |

There is no dispute that Mr. Lorenzana's criminal history category is I.[1] Pursuant to the Sentencing Table, an offense level of 41 with a criminal history category of I corresponds to a term of imprisonment of 324 – 405 months. Mr. Lorenzana objects to the PSR's and government's request for upward adjustments in their totality.

***No basis in the record to support a 6-level enhancement***

In support of its request for an effective life sentence, the government relies upon the "relevant conduct in the presentence report" (which merely parrots information provided to PSR writer by the government) as well as "proffered relevant conduct" from trial testimony of government cooperators Otto Herrera Garcia and Byron Linares Cordon.[2]

The local jury instructions warn that the testimony of cooperators should be "considered with caution."[3] The government's proposal that the Court blindly accept these witnesses' testimony in a separate trial is insufficient and unfair to Mr. Lorenzana. Mr. Lorenzana concedes that the Court may consider hearsay evidence at sentencing; however, that

---

[1]     Mr. Lorenzana has no criminal record in the United States or Guatemala. *See* Exh. 1.

[2]     Gov. Sent. Memo. at 6 – 16.

[3]     *See, e.g.,* Red Book Instructions 2.22, 2.22a, 2.24.

evidence must have some indicia of reliability to support it.[4]  The Commentary to Guideline §

6A1.3 specifically states that:

> Although lengthy sentencing hearings seldom should be necessary, disputes about sentencing factors must be resolved with care. *When a dispute exists about any factor important to the sentencing determination, the court must ensure that the parties have an adequate opportunity to present relevant information.* Written statements of counsel or affidavits of witnesses may be adequate under many circumstances. *An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues.* The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

> In determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. *Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy.* Reliable hearsay evidence may be considered. Out-of-court declarations by an unidentified informant may be considered where there is good cause for the non-disclosure of the informant's identity and there is sufficient corroboration by other means. *Unreliable allegations shall not be considered.*

> The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case.[5]

On the record before it, the Court cannot make a determination as to the

applicability of the enhancements sought by the government.  The government's various

transcript excerpts of Herrera Garcia's and Linares Cordon's testimony and their proffers are

plainly insufficient because the Court cannot make a finding of reliability as to Mr. Lorenzana

based solely on them.  That the government relies entirely on the uncorroborated testimony of

Herrera Garcia concerning alleged discussions with Mr. Lorenzana to support a role

enhancement should raise concern for the Court.  Mr. Lorenzana denies any discussions with

Herrera Garcia and denies that he was a leader or organizer of the criminal activity involving his

sons.

---

[4]     *See United States v. Bras*, 483 F.3d 103, 108 (D.C. Cir. 2007).

[5]     U.S.S.G. § 6A1.3 (Commentary) (emphasis added; citations omitted).

Both Herrera Garcia and Linares Cordon are admitted high-level drug traffickers who received substantial benefits in the form of sentence reductions by testifying for the government. Mr. Lorenzana did not participate in the trial in which they testified and has no meaningful opportunity to challenge the statements made about him. At the very least, the Court should hold an evidentiary hearing where the government has the burden of producing reliable evidence upon which the Court can find, or not, by a preponderance of the evidence whether the enhancements apply.[6] This is especially so where the proposed enhancements raise the offense level from level 35 (168 – 210 months) to level 41 (325 – 405 months), an increase of 156 to 195 months.

To the extent the Court allows the government to proceed on the trial testimony and non-testimonial statements of the government's witnesses, Mr. Lorenzana has requested that the government produce any material that would normally be produced pursuant to 18 U.S.C. § 3500 that is relevant to the proffered testimony. Without this material, as well as without live testimony, Mr. Lorenzana will be not be able to properly defend himself at sentencing and the Court will not be able to make a determination as to the reliability of the statements or the applicability of the enhancements sought by the government.

---

[6]    *See United States v. Jimenez Martinez*, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of *affidavit* on which the district court relied at sentencing); *United States v. Roberts*, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity). *See also United States v. Bras*, 483 F.3d 103 (D.C. Cir. 2007) (sentencing court conducted two-day hearing to determine amount of loss for guideline purposes); *United States v. Hart*, 324 F.3d 740 (D.C. Cir. 2003) (sentencing court held evidentiary hearing to determine applicability of enhancements).

## <u>SECTION 3553(a) FACTORS</u>

The Supreme Court decided in *United States v. Booker,*[7] that the federal Sentencing Guidelines are advisory provisions that recommend a particular sentencing range, rather than require it. When imposing sentences, a district court must "treat the Guidelines as the starting point and initial benchmark."[8] A district court must next consider the sentencing factors set forth in 18 U.S.C. § 3553(a). But the Court should not presume a Guideline sentence will always satisfy § 3553(a), because the Guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives."[9]

A district court has an independent duty to ensure that the § 3553(a) factors are met. A court is free to reject a Guidelines sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps *because the case warrants a different sentence regardless*."[10] A sentencing judge also "may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines."[11]

In addition a sentence must honor the statutory Parsimony Clause's "overarching command" that courts "'impose a sentence sufficient, but not greater than necessary, to comply with' the basic aims of sentencing . . . ."[12] This proscription was designed to ensure that sentencing reflects reasoned judgment that is reviewable on appeal.[13]

---

[7]    543 U.S. 220 (2005).

[8]    *Kimbrough v. United States,* 552 U.S. 85, 108 (2007) (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)) (internal quotations omitted).

[9]    *Rita v. United States,* 551 U.S. 338, 351 (2007); *Book*er, 543 U.S. at 245.

[10]    *Rita,* 551 U.S. at 350-51 (emphasis added).

[11]    *Kimbrough*, 552 U.S. at 101.

[12]    *Kimbrough*, 552 U.S.at 101 (2007); *Rita,* 551 U.S. at 348; 18 U.S.C. § 3553(a).

In imposing a sentence that is "sufficient, but not greater than necessary," the court should look to the seven statutory factors listed under Section 3553. These factors include:

### 1.      Nature and circumstances of the offense and history and characteristics of the defendant

There is no denying that the offense of conviction is serious and dangerous. However, the offense itself should not drive the sentence imposed in this case, at least not in the unbalanced way the Government seeks.

Mr. Lorenzana took responsibility for his wrongful conduct because it was the right thing to do. As the Court may recall, during the almost three-hour plea colloquy, Mr. Lorenzana did not blindly accept the government's factual proffer, but was very specific in acknowledging what he did and was very consistent in admitting his illegal conduct. After extensive discussion about what conduct Mr. Lorenzana would agree to, the Court summarized it as follows:

> THE COURT: Okay. So your sons were dealing with the Herreras, and the Herreras were paying your son in dollars; is that correct?
>
> THE INTERPRETER: That is so.
>
> THE COURT: Okay. And so from your perspective, because they were paying in dollars, you assumed that they were getting the dollars because, somewhere along the line, the cocaine was being sold in the United States?
>
> THE INTERPRETER: That is also true.
>
> THE COURT: Okay. So what we have -- and correct me if I am wrong -- What we have is, you owned property in Guatemala, you allow your son to use the property, and you know that your son is using the property, along with the Herreras, for the storage of cocaine, and that the cocaine then moves out of your property at certain points. It's not stored there permanently.

---

[13]     *United States v. Johnson,* 635 F.3d 983, 988 (7th Cir. 2011) (vacating); *United States v. Reyes-Hernandez,* 624 F.3d 405, 420 (7th Cir. 2010); *United States v. Dorvee,* 616 F.3d 174, 182-84 (2nd Cir. 2010); *United States v. Olhovsky,* 562 F.3d 530, 547-48 (3rd Cir. 2009).

> You also know that the Herreras have been dealing with, working with and selling
> to the Mexicans; and that the Herreras, who made payments to your son that
> you're aware of, paid in dollars, which would give you notice that the Herreras
> were selling to the Mexicans, the Mexicans were selling to the United States,
> because the money that was coming back came in dollars, which meant that it
> came from the United States. Would you agree with that?
>
> THE INTERPRETER: Yes, I agree.[14]

Beyond receiving payment for letting his sons use his property to store the cocaine, Mr.
Lorenzana denies that he ever authorized, directed or otherwise had a supervisory role over what
his sons were doing. He clearly acknowledged knowing what the sons were doing but does not
accept that he was a leader or organizer of the criminal activity. In fact, beyond the few times
Herrera Garcia mentions Mr. Lorenzana, it is evident that he was dealing directly with Mr.
Lorenzana's sons without the involvement of Mr. Lorenzana. For example:

- Haroldo Lorenzana was the primary person Herrera Garcia dealt with;[15]

- Paid Haroldo Lorenzana for the drugs stored at Las Canas;[16]

- Haroldo Lorenzana suggested another location when the first one was
  compromised;[17]

- Haroldo Lorenzana suggested the use of La Melonera;[18]

- Drugs were taken to La Calera, owned by Haroldo Lorenzana;[19]

---

[14]    Plea Hr'g Tx. at 63:3 – 64:2 (Aug. 18, 2014).

[15]    Trial Tr. 32:6 – 32:9 (March 1, 2016 pm).

[16]    Trial Tr. 36:15 – 36:17 (March 1, 2016 pm).

[17]    Trial Tr. 38:8 – 38:12 (March 1, 2016 pm).

[18]    Trial Tr. 40:4 – 40:8 (March 1, 2016 pm).

[19]    Trial Tr. 44:24 – 45:17 (March 1, 2016 pm).

- Haroldo Lorenzana was paid for the work;[20]

- Haroldo Lorenzana approached Herrera Garcia again to use a different airfield;[21]

- Herrera Garcia paid Haroldo Lorenzana for a load;[22]

- Haroldo Lorenzana found a new location for offloading drugs;[23]

- Herrera Garcia paid Haroldo Lorenzana for his involvement in trafficking 450 kilograms of cocaine;[24]

- Haroldo Lorenzana handled shipments of cocaine at properties owned by him;[25]

- Haroldo Lorenzana, Eliu Lorenzana and Waldemar Lorenzana Cordon had their own customers who would buy cocaine from them;[26]

- Haroldo Lorenzana, Eliu Lorenzana and Waldemar Lorenzana Cordon were buying the cocaine;[27]

- Herrera Garcia did over 10 jobs with Haroldo Lorenzana;[28]

- Haroldo Lorenzana was involved in the air drop operations;[29]

---

[20]    Trial Tr. 47:22 – 47:4 (March 1, 2016 pm).

[21]    Trial Tr. 49:16 – 49:19 (March 1, 2016 pm).

[22]    Trial Tr. 59:7 – 59:8 (March 1, 2016 pm).

[23]    Trial Tr. 60:4 – 60:5 (March 1, 2016 pm).

[24]    Trial Tr. 63:13 – 63:16 (March 1, 2016 pm).

[25]    Trial Tr. 63:22 – 64:5 (March 1, 2016 pm).

[26]    Trial Tr. 64:6 – 64:11 (March 1, 2016 pm).

[27]    Trial Tr. 67:22 – 67:24 (March 1, 2016 pm).

[28]    Trial Tr. 72:8 – 72:13 (March 1, 2016 pm).

[29]    Trial Tr. 13:11 – 13:13 (March 2, 2016 am).

Herrera Garcia's exclusive involvement with Mr. Lorenzana's sons in drug trafficking is indicative of Mr. Lorenzana's limited role in the illegal activity.

Similarly, Linares Cordon also worked exclusively with Mr. Lorenzana's sons:

- Linares Cordon got involved in drug trafficking at a meeting called by Haroldo Lorenzana;[30]

- Haroldo Lorenzana paid Linares Cordon for his work;[31]

- Linares Cordon worked for Haroldo Lorenzana when taking drugs to border with Mexico;[32]

- Herrera Garcia sold the cocaine and Haroldo Lorenzana bought it;[33]

- Herrera Garcia told Linares Cordon that a drug deal was only for Haroldo Lorenzana and that he did not want any trouble with Mr. Lorenzana;[34]

These instances of Herrera Garcia and Linares Cordon clearly stating how they worked exclusively with Mr. Lorenzana's sons are consistent with Mr. Lorenzana's position that he merely received funds from his sons and that he was not a leader or organizer of the criminal activity.

Mr. Lorenzana is an 80-year old Guatemalan male, born out of wedlock, who met his father for the first time at the age of ten. Due to the grinding poverty in rural Guatemala, Mr.

---

[30]     Trial Tr. 96:6 – 95:15 (February 23, 2016 am).

[31]     Trial Tr. 101:12 – 101:13 (February 23, 2016 am).

[32]     Trial Tr. 103:21 – 103:25 (February 23, 2016 am).

[33]     Trial Tr. 104:24 – 105:4 (February 23, 2016 am).

[34]     Trial Tr. 23:2 – 23:22 (February 23, 2016 pm).

Lorenzana began selling bread on the streets at the age of six in order to help support his family. He continued to work hard for his family and was educated only through the second grade. Fortunately, there was no abuse or neglect in his childhood home. Mr. Lorenzana had a first marriage that resulted in 2 children.

His second union, to Marta Julia Cordon, has lasted for over 50 years and resulted in 5 children. Unfortunately for the family, three of those children, Eliu Lorenzana, Waldemar Lorenzana Cordon and Haroldo Lorenzana have been indicted along with Mr. Lorenzana. Eliu Lorenzana and Waldemar Lorenzana Cordon are serving life sentences for their crimes. Haroldo Lorenzana was recently arrested in Guatemala and is pending extradition to the United States. It was the conduct of those sons that led Mr. Lorenzana to be where he is today.

Mr. Lorenzana has worked hard all his life and built a life for himself and his family in the agricultural field. It was when he ran into financial difficulties that he became involved in his sons' ventures with Herrera Garcia. As Herrera Garcia testified, at the first meeting with Mr. Lorenzana, Mr. Lorenzana offered to sell his property to Herrera Garcia because of those financial difficulties.[35]

Persons who know Mr. Lorenzana well, attest to his generosity and love for his community. For example,

- Auxiliary Mayor Carlos Lopez y Lopez states that Mr. Lorenzana is "an honest, responsible and humanitarian person. He has great social trajectory in my town. He has supported health, education, economy, sports, the environment."[36]

---

[35]     Trial Tr. 27:25 – 28:9 (March 1, 2016 pm).

[36]     Exh. 2.

- Mayor Jose F. Mejia Flores notes that Mr. Lorenzana "for many years has been dedicated to protect our residents, helping each person as an individual as well as the community as a whole; there is a great example of the latter in the village of El Paso de Los Jalapas as Mr. Waldemar Lorenzana has greatly contributed to the development of the place in the area of education by making a contribution to keep an institute operating, which has diverse levels of education for a bachelor's degree and expert level education in the areas of marketing and publicity, which has been serving and educating our community for more than five graduating classes; moreover, said place houses a childcare facility, which has been very important for the care of minors." The Mayor further states that Mr. Lorenzana is honest, upstanding, hardworking and respectful. [37]

- Pastor Maricela Ramirez Alvarado notes how Mr. Lorenzana is a "friendly, hardworking and generous man with his neighbors, especially those who need it most, either because of health issues or poverty." She further noted how Mr. Lorenzana has supported families with school supplies and medications.[38]

- Father Carlos Romero notes how Mr. Lorenzana is a "generous and with a disposition to help his neighbor, for example people who have limited resources and suffer from illness or need a job. … He has always been known for creating employment opportunities in the areas of agriculture and livestock …."[39]

- Principal Jose Acevedo notes how Mr. Lorenzana has contributed school supplies and backpack for students.[40]

---

[37]     Exh. 3.

[38]     Exh. 4.

[39]     Exh. 5.

- Finally, Marta Julia Lorenzana de Cordon, Mr. Lorenzana's wife, begs the Court for mercy for her husband of 56 years. She notes that "despite lacking support from his father, he has always had the mentality to succeed …. As you may understand, I am the person who has been affected the most by this situation … you will ascertain that my health has been declining in the last few years, after being a healthy person; now, this is due to the family issues we have gone through, so many concerns, discouragements, and illnesses because of so many years of not seeing him (almost 6 years) and this after having seen him every single day before; as you can imagine, this is very hard and difficult for me. … He is a generous man, loving, the backbone of our family; he is a man who is compassionate and who has great love for his entire family, and his people, one who has helped his neighbors with needs." [41]

The Court is also aware of the mental health problems suffered by Mr. Lorenzana for which he has been hospitalized at the Butner Medical Center for over four years.[42] Because of the extensive litigation and discussion of these problems, Mr. Lorenzana will not repeat the content of the many reports prepared over the years and incorporates them by reference. In particular, Mr. Lorenzana notes the opinion of Sonia Ruiz, Psy. D.:

> In my view, the Defendant suffers from a major mental disorder, Moderate Cognitive Impairment of the Alzheimer's Type. As is well known, in the process of dementia, there is functional and cognitive impairment which is progressive and irreversible. It seems that he was already showing signs of his disease at the time he took the guilty plea. His participation in the hearing was mostly limited to saying yes or agreeing to matters that were quite complicated, especially with his low level of education. It was unlikely that he had a rational understanding of what he was doing. It is not likely that he was able to critically evaluate and

---

[40]    Exh. 6.

[41]    Exh. 7.

[42]    The PSR completely ignores Mr. Lorenzana's mental health issues. Mr. Lorenzana respectfully requests that the various mental health evaluations and reports prepared thus far be incorporated into the PSR for transmission to the Bureau of Prisons.

challenge information or to review documents and evidence leading to his charges and understand them adequately.[43]

Mr. Lorenzana's cognitive deficiencies should be given great weight by the Court in determining a sentence.

Mr. Lorenzana's conduct have not only caused him tremendous loss and pain (including loss of freedom for him and three sons), but also have greatly affected his wife and extended family and caused tremendous upheaval that would only be exacerbated by an effective life sentence.

### 2. Need for the sentence imposed

In addition to considering the above factors, the Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2."[44] Section 3553(a)(2) states that such purposes are: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

### A. Seriousness of the offense, respect for the law, just punishment

At the time of sentencing, Mr. Lorenzana will have been incarcerated for over 8 years and nine months. The government seeks what is effectively a life sentence based principally on the word of one cooperator, Herrera Garcia. A defendant who has accepted

---

[43]    Psych. Eval. By Sonia I. Ruiz, Psy.D.  (May 21, 2017).

[44]    18 U.S.C. § 3553(a)(2).

responsibility for his actions, who was not violent nor directed violence and who was tangentially involved in the criminal activity, does not merit a life sentence.

A Guatemalan male has a life expectancy of 70.4 years.[45] Currently 80 years old, Mr. Lorenzana would surely die in prison if sentenced as the government requests. A sentence of 10 years, Mr. Lorenzana submits, would be sufficient but nor greater than necessary to compensate for the seriousness of his offense, to instill respect for the law and to impose just punishment. A life sentence, as the government effectively demands, should be reserved for the absolute worst offenders. Here, the government has not demonstrated the need for such a sentence.

In imposing a sentence, the Court should also consider the rationale behind the compassionate release provision of the First Step Act OF 2018.[46] The First Step Act amends 18 U.S.C. §3582(c) regarding when a court can modify a term of imprisonment once it is imposed. Under §3582(c)(1)(A), a court, upon a petition from Bureau of Prisons, can reduce a prisoner's sentence and impose a term of probation or supervised release, with or without conditions, equal to the amount of time remaining on the prisoner's sentence if the court finds that "extraordinary and compelling reasons warrant such a reduction," or the prisoner is at least 70 years of age, the prisoner has served at least 30 years of his/her sentence, and a determination has been made by BOP that the prisoner is not a danger to the safety of any other person or the community. In including this provision, Congress addressed the need to reduce size of the federal prison population while also creating mechanisms to maintain public safety. Congress also recognized

---

[45]   *See* https://www.worldlifeexpectancy.com/guatemala-life-expectancy

[46]   115 P.L. 391, 132 Stat. 5194, 2018 Enacted S. 756, 115 Enacted S. 756

the reality that older prisoners will likely not recidivate and will pose a burden on the penal system with the medical costs associated with an aging prisoner population.

Here, Mr. Lorenzana is 80 years of age and there is no indication that he is a danger to the safety of any other person or the community. In fact, the psychological evaluation by Adeirdre Stribling Riley, Ph.D., specifically notes that the "Risk Panel was in agreement with the findings of the evaluators detailed in the 11/01/17 forensic evaluation, rendering Mr. Lorenzana-Lima at low risk of engaging in future dangerous behaviors."[47] Although the First Step Act does not strictly apply to Mr. Lorenzana, the policy behind the compassionate release provision should inform the Court's judgment.

The government's recommended sentence of life in prison is excessive and in Mr. Lorenzana's view, vindictive, considering the sentences that the government has agreed to for many other high-profile large-scale narcotics traffickers who were much more dangerous and culpable that Mr. Lorenzana.

### B & C.  Deterrence to criminal conduct and protection from further crimes

As noted above, imposition of a 120-month sentence will incarcerate Mr. Lorenzana for a substantial period of time, especially given his age. Such a lengthy period will serve to deter further criminal activity and protect the public. It is well recognized that recidivism rates decline relatively consistently as age increases.[48] At 80 years-old, Mr. Lorenzana has surpassed his life expectancy and American society would not be further served

---

[47]     Forensic Evaluation by Adeirdre Stribling Riley, Ph.D. (Aug. 16 2018).

[48]     United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 2 (May 2004) ( *available at* http://www.ussc.gov/Research/Research_Publications/publications.cfm); Miles D. Harer, "Recidivism among federal prisoners released in 1987, JOURNAL OF CORRECTIONAL EDUCATION (1994 ) (available at http://149.101.37.70/news/research_projects/published _reports/recidivism/oreprrecid87.pdf).

by an extreme sentence as suggested by the government. Once he serves his sentence, Mr. Lorenzana would be deported to Guatemala, where he would not pose a further danger to the United States.

### D. Provide treatment and training

Mr. Lorenzana's education ended in the second grade. At his advanced age, there is no need for treatment and training. He has no history of substance abuse.

### 3 & 4. Kinds of sentences available and the sentencing ranges established

The Statutory and Guidelines Analysis section above discusses these factors.

### 5. Pertinent policy statement

There does appear to exist any applicable pertinent policy considerations.

### 6. Need to avoid sentencing disparities

The government alleges that Mr. Lorenzana, as part of the Lorenzana DTO, was involved in trafficking of thousands of kilos of cocaine to the United States. While the government's quantity estimates are conjectural, the sentence of life years urged by the government would result in an inequitable and strikingly disparate sentence when compared to other similar cases *actually tried* around the country and would be far greater than necessary to comply with the basic aims of sentencing. *See United States v. Carlos Patiño Restrepo*, 02-CR-1188 (LDW) (E.D.N.Y. 2012), (alleged leader of Colombia's North Valley Cartel, charged with conspiracy to import thousands kilos of cocaine to the United States and alleged to have been involved in the murders of multiple individuals; *sentenced to 40 years after trial*);[49] *United States v. Omar Garcia Varela*, 99-CR-0804 (CMA) (S.D. Fla. 2011) (major Colombian cocaine trafficker, responsible for importation of thousands of kilos of cocaine and multiple murders

---

[49] *See* Exh. 8; Judgment in a Criminal Case.

including government informant; *sentenced to 280 months (23.3 years) after trial)*;[50] *United States v. Jorge Mario Paredes*, 03-CR-0987 (DAB) (S.D.N.Y. 2010) (large scale Guatemalan drug trafficker, alleged to have trafficked many thousands of kilos of cocaine to the United States; *sentenced to 31 years after trial*);[51] *United States v. Erminso Cuevas Cabrera*, 04-CR-446 (TFH) (D.D.C.) (FARC defendant alleged to have managed cocaine laboratories for the FARCS's 14th Front, oversaw production and distribution of hundreds of thousands of kilograms of cocaine and converted as much as 2.5 tons of cocaine paste into cocaine approximately several times per month; *sentenced to 29 years after trial*);[52] *United States v. Juan del Cid Morales*, 06-CR-0248 (JDB) (D.D.C. 2008) (Guatemalan official alleged to have conspired to traffick thousands of kilos of cocaine to the United States; *sentenced to 220 months (18.3 years) after trial*);[53] *United States v. Fabio Ochoa*, 99-CR-06153 (SDFL 2003) (leader of Colombian Cali Cartel, alleged to have trafficked multiple tons of cocaine to the United States and to have directed the murder of a government informant; *sentenced to 35 years after trial*);[54] and *United States v. Samuel Santander Lopesierra*, 02-CR-0392(RJL) (DDC 2007) (large-scale Colombian drug trafficker alleged to have trafficked thousands of kilos of cocaine to the United States; *sentenced to 300 months (25 years) after trial*).[55]  If anything, Mr. Lorenzana's crimes are lesser in scope than that of these defendants *who went to trial* and received sentences commensurate with what the government demands.

---

[50]    *See* Exh. 9; Judgment in a Criminal Case.

[51]    *See* Exh. 10; Judgment in a Criminal Case.

[52]    *See* Exh. 11; Judgment in a Criminal Case; Exh. 12; Indictment ¶¶ 35(d), 35(d)(iii) (excerpts).

[53]    *See* Exh. 13; Judgment in a Criminal Case.

[54]    *See* Exh. 14; Judgment in a Criminal Case.

[55]    *See* Exh. 15; Judgment in a Criminal Case.  The government requested a sentence between 36 and 40 years.

In *United States v. Diego Montoya*, 09-CR-20665 (S.D. Fla. 2009) the defendant was the undisputed leader of Colombia's North Valley Cartel; was directly responsible for importing innumerable tons of cocaine into the United States; was directly responsible for the deaths of hundreds in Colombia; was responsible for the death of at least one government informant and was charged in at least three separate indictments.[56]  Montoya pled guilty and was sentenced to a term of 45 years.[57]  Other high-profile traffickers have been sentenced to less time than the government requests.  For example: *United States v. Osiel Cardenas Guillen*, 00-CR-118 (S.D. Tex. 2010) (defendant was the leader of the Gulf Cartel that allied itself with the Zetas; was responsible for importing tons of cocaine into the United States and much violence in Mexico; sentenced to 25 years after a plea); *United States v. Hector Palma Salazar* (C.D. Cal. 1995) (defendant was a co-founder of the Sinaloa Cartel with Joaquin "Chapo" Guzman; was responsible for importing thousands of kilos of cocaine into the United States; sentenced to 26 years after a plea; released in June 2016); *United States v. Benjamin Arellano Felix*, 97-CR-2520 (S.D. Cal. 2012) (defendant was leader of the Tijuana Cartel; responsible for shipping thousands of kilos of cocaine to the United States; sentenced to 25 years after a guilty plea).  These defendants were higher level traffickers who pled guilty and were sentenced to less time than sought here by the government.  The Court must consider these sentences in fashioning a sentence for Mr. Lorenzana.

### 7.    Need to provide restitution

Here, restitution is not an issue and there is no specific victim that incurred financial loss or suffered physical harm relating to Mr. Lorenzana's offense conduct.

---

[56]    *See* Exh.16; Factual Proffer in Support of Guilty Plea.

[57]    *See* Exh 17; Judgment in a Criminal Case.

## OTHER FACTORS

### *Consideration of status as deportable alien*

Mr. Lorenzana's status as a deportable alien may warrant an additional reduction of his

sentence.  The United States Bureau of Prisons is authorized by statute[58] to assure that an inmate

must be afforded a reasonable opportunity to adjust to, and prepare for, re-entry into the

community.  However, in *Lartey v. Department of Justice,*[59] the court determined that the right

to participate in pre-release programs only applied to prisoners that were being released into the

community within the United States, thereby excluding deportable aliens.  In *United States v.*

*Smith,*[60]  the District of Columbia Circuit ruled that a downward departure may be appropriate

where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the

severity of his sentence.  Thus, under a guideline sentence, Mr. Lorenzana would be eligible for a

downward departure of up to six months as a result of his status as a deportable alien.

### *Consideration of credit for time served*

Mr. Lorenzana respectfully urges the Court to give him full credit for the time he

has been incarcerated since April 26, 2011.  Title 18 U.S.C. § 3585(b) states that "[a] defendant

shall be given credit toward the service of a term of imprisonment for any time he has spent in

official detention prior to the date the sentence commences – (1) *as a result of the offense for*

*which the sentence was imposed*; …"  The Bureau of Prisons' (BOP) regulations state that "if the

---

[58]  *See* 18 U.S.C. § 3624(c), which directs the Bureau of Prisons, to the extent practicable, to assure that prisoners spend part of the last 10% of their sentences (but no more than six months) under conditions -- possibly including home confinement -- that will "afford the prisoner a reasonable opportunity to adjust to and prepare for his re-entry into the community."  Bureau of Prisons regulations bars non-U.S. citizens from assignment to a Community Corrections Center except in what appear to be rare circumstances.  *See* Federal Bureau of Prisons, Program Statement 5100.04: Security Designation and Custody Classification Manual, Ch. 2-9 (June 15, 1992).

[59]  790 F. Supp 130 (W.D. La. 1992).

[60]  27 F.3d 649 (D.C. Cir. 1994).

federal defendant has been in pre-sentence state or foreign custody on essentially the same charges as federal charges, credit shall also be given even though a federal detainer may not have been on file during that time."[61]  Therefore, Mr. Lorenzana respectfully requests that the Court apply credit for the entire time that he has been in custody.

### *BOP Designation*

To the extent possible, Mr. Lorenzana respectfully requests that the Court recommend that the Bureau of Prisons maintain him at Butner Medical Center where he can receive the care and attention he needs.

## <u>CONCLUSION</u>

Mr. Lorenzana respectfully requests that the Court impose a sentence of 120 monthds.  In light of *Booker* and *Hughes* such a sentence is reasonable and sufficient to serve the criteria laid down in 18 U.S.C. § 3553(a).

**Dated**: Washington, DC
January 27, 2020

Respectfully submitted,

**BALAREZO LAW**

/s/

By: _____
A. Eduardo Balarezo
D.C. Bar # 462659
400 Seventh Street, NW
Suite 306
Washington, DC  20004
(tel) 202-639-0999
(fax) (202)-639-0899
aeb@balarezolaw.com

*Counsel for Defendant Waldemar Lorenzana*

## <u>CERTIFICATE OF SERVICE</u>

---

[61]     *BOP Manual on foreign incarceration credit*, CN-03, June 30, 1997, Chapter 6, p.7.

**I HEREBY CERTIFY** that on this 27th day of January 2020, I caused a true and correct copy of the foregoing Defendant's Memorandum in Aid of Sentencing to be delivered via E-Mail and ECF to the Parties in this case.

/s/
_____
A. Eduardo Balarezo